UNITED STATES of America,
Plaintiff-Appellant,

v.

SEMINOLE COUNTY SCHOOL DISTRICT and John G. Angel, Superintendent of Schools, Seminole County School District, Florida, Defendants-Appellees.

No. 76-2749.

United States Court of Appeals,
Fifth Circuit.

June 13, 1977.

John L. Briggs, U. S. Atty., Kendell W. Wherry, Asst. U. S. Atty., Orlando, Fla., Neal J. Tonken, Martin D. Buckley, Brian K. Landsberg, J. Stanley Pottinger, Asst. Atty. Gen., Civil Rights Division, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Douglas Stenstrom, Ned N. Julian, Jr., S. Joseph Davis, Jr., Sanford, Fla., for defendants-appellees.

Before GOLDBERG, CLARK and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

In this school case the Government seeks modification of a 1970 consent decree which

has failed to achieve its projected results. More specifically at issue is an elementary school that has remained identifiably black, contrary to the expectations on which the consent decree was based. We find that the School Board's conduct since 1970 has not rendered its system unitary and that no cognizable barriers prevent integration of this school. In these circumstances the system-wide constitutional violation admitted in 1970 continues and justifies the further relief requested. We reverse the district court's denial of relief.

I.

In July 1970 the United States filed suit against the Seminole County School District alleging that it had failed to dismantle the dual school system established prior to the decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Board did not deny the presence of a constitutional violation, and the parties focused on formulating a remedy. The Board submitted a plan to which the Government acceded, and the court entered a consent decree.

The Board's contemporaneous explanation of the plan, submitted to the Government and to the court in soliciting their approval, made clear that the primary goal was to eliminate the racial identifiability of the county's six formerly all black schools. The Board projected that its plan would produce white majorities in five of the six schools and that the sixth, Midway Elementary School, would have 60 white students and 300 black students. In explaining its treatment of Midway, the Board said,

> We believe . . . that in view of all the other actions of the District School

Board and because of the unique location of this school, the racial identification of this school over a period of time will be removed.[1]

The Board implemented the plan beginning with the 1970–71 term. The Board's projections with respect to Midway Elementary School failed to materialize. Only 15 whites entered Midway at the year's beginning, 26 were there at one time or another, and 20 whites attended Midway at year's end.

The Midway situation did not improve in subsequent years. Midway has never had more than 28 white students. In 1975–76 it had six whites and 323 blacks. Accordingly, in September 1975 the Government returned to court seeking further relief with respect only to Midway Elementary School.[2]

The Board apparently concedes that Midway is and has always been a racially identifiable school. Indeed, that conclusion is inescapable. In a county of 15% blacks, Midway's black enrollment has never been less than 92% and is currently more than 98%. Midway, once all black pursuant to state law, remains a black school. Furthermore, Ralph Ray, administrative assistant and public information officer for the Seminole County schools, candidly testified that whites with elementary age children cannot be expected to move into the Midway attendance zone and that the reason may be the school's racial composition. Midway clearly will continue as an identifiably black school unless the Government obtains a modification of the attendance plan.

II.

The Board argues, however, that there is no predicate on which further relief can be

---

1. It is difficult to comprehend the basis for this sanguine prediction. Midway is located near the east side of a geographically isolated, all-black community bounded on the north and east by a railroad and on the south by a highway and airport. The community's westernmost street is separated from the eastern city limits of Sanford, Florida, and from the nearest street to the west by approximately ½ mile. Its western attendance zone line runs down the middle of this unsettled ½ mile strip.

2. The Government styled its plea a "motion for order to show cause", asking the district court to require the School Board to come forward with plans for effectively desegregating Midway. At a hearing on the motion the Government presented evidence, and in addition the parties have stipulated the accuracy of various statistical tables. We treat the Government's motion as a request for modification of the 1970 decree.

based. It contends that the mere presence of an identifiably black school in a district that has not intentionally discriminated on the basis of race does not establish a constitutional violation or call for an equitable remedy. Cf. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Although by agreeing to the consent decree in 1970 the Board conceded the existence of a pre-1970 constitutional violation, the Board argues that its faithful observance of the consent decree and blameless conduct since 1970 purge the prior violation.

The Supreme Court recognized the possibility of such purging in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 31, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), saying that at some point school districts should have achieved full compliance with *Brown* and that they would then be "unitary." The Board here seizes upon *Swann's* language and argues that, with the exception of Midway, its schools no longer contain vestiges of the old dual system. Viewed as a whole, says the Board, the Seminole County system is now unitary, and further relief therefore should not be granted.

The legal issues raised by the Board's argument are important and difficult. To accept the Board's position we would have to hold, in effect, that a concededly unconstitutional dual system could become unitary through the coalescence of (1) the passage of time and (2) the implementation of attendance changes that integrate most schools but leave one virtually all black

school that was predestined for this status and that apparently could easily be effectively integrated.

■ We find it unnecessary to resolve this complex issue, however, for the record belies the Board's assertion that in other respects its system is unitary. Of 25 elementary schools in Seminole County, 11 are racially identifiable: ten are virtually all white and Midway is virtually all black.[3] Remarkably, the Board has opened seven of the ten white elementary schools since entry of the consent decree.

A similar situation obtains with respect to the middle and high schools. Three of the seven middle schools are virtually all white; the Board has opened two of the three white schools since the Government acceded to the consent decree.[4] Two of the five high schools are virtually all white[5]; neither was in existence at the time of the consent decree.[6]

The record gives little indication of why the new schools are effectively segregated. The reason does not appear to be their convenient location. For example, the newest school, Woodlands Elementary, was slated to open in January 1976 with 536 students (529 white), of which 504 had to be bused from more than two miles away.

The totals evince a school system far different from the unitary system Seminole County claims to have. Sixteen of the 38 schools are racially identifiable; 11 of the 16 identifiable schools have been opened during the post-decree period.[7] Eleven of

**3.** The 1975–76 black population in the ten virtually all white elementary schools ranged from 0.14% (one student of 732) to 1.77%.

**4.** The black population in the three white middle schools ranged from 1.85% to 2.10%.

**5.** The black populations in the two white high schools were 0.68% and 1.34%.

**6.** Judge Roney would not discuss the middle and high schools. He believes the original plan's failure to achieve the intended results mandates desegregating Midway irrespective of the intervening developments in the schools at higher levels. Judges Goldberg and Clark believe it appropriate to decide whether the system as a whole has become unitary. They

include the discussion of the middle and high schools solely to demonstrate that the system is not unitary. The government has sought, and this appeal involves, only the issue of relief with respect to a single school, Midway Elementary.

**7.** Our situation is therefore unlike that presented in *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). *Spangler* held that a district court cannot mandate annual realignment of attendance zones when, having achieved its projected level of integration for a time and having obtained racial neutrality, the original plan results in less than the projected level of integration solely because of normal human

14 schools opened since 1970 are virtually all white. The Board's contention that its long and faithful observance of the 1970 decree has transformed its formerly dual system into a unitary system cannot be sustained on these facts.

The Board has therefore failed to purge the original constitutional violation established by the 1970 admission of liability. We need not find a new constitutional violation; the acknowledged pre-1970 intentional segregation of Midway has not been remedied.

### III.

We turn therefore to the issue of an appropriate remedy. The Board does not and could not seriously contend that a remedy leaving Midway identifiably black could pass muster under our prior decisions. No physical barriers prevent transporting students in ways that would integrate Midway, and there has been no showing that the current situation comprises the maximum integration practicably achievable. Our decisions approving the retention of one or more racially identifiable schools therefore cannot aid Seminole County. *Compare Stout v. Jefferson County Board of Education*, 537 F.2d 800 (5th Cir. 1976) (retention of three one-race schools approved in system which had become fully unitary and in which geography and demography prevent-

ed achievement of greater level of desegregation) *and Carr v. Montgomery County Board of Education*, 377 F.Supp. 1123, 1132 (M.D.Ala.1974), *aff'd*, 511 F.2d 1374 (5th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975) (retention of small number of one-race elementary schools approved where no alternative could achieve "any effective and realistically stable desegregation" and where every student would eventually attend a completely integrated high school), *with, e. g., Ellis v. Board of Public Instruction*, 465 F.2d 878 (5th Cir. 1972), *cert. denied*, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973) (*Ellis II*) (three virtually one-race elementary schools must be desegregated despite integration of remainder of large system; no barriers prevented such desegregation).

The Government's uncontradicted assertion is that Midway could be integrated quite easily.[8] Although further factual development will be necessary with respect to specific alternatives, at this stage we can conclude only that effective methods for desegregating Midway are readily available. The original plan having failed to achieve its projected results and having proved constitutionally inadequate, the district court must order further relief. *See, e. g., Ellis v. Board of Public Instruction*, 465 F.2d 878 (5th Cir. 1972), *cert. denied*,

---

migration. In *Spangler* there were apparently no racially identifiable schools; the district court sought only to improve the ratios.

Here, in contrast, the Seminole County plan failed to achieve its intended results from the very beginning, and Midway remains racially identifiable. Moreover, especially given the School Board's record of opening new identifiably white schools we cannot conclude that the current deviations from the original plan derive solely from normal demographic changes.

8. The Government suggested several pairing or clustering arrangements that the Board does not deny could be easily instituted. The Board assigned as reasons for opposing various remedies its aversion to creating additional schools with black majorities, its opposition to redistribution of state aid computed on a per pupil basis, and its desire not to engage in additional busing. None of these reasons is substantial.

The Board's reliance on opposition to busing is curious. Less students are bused to Midway

than to any other school in the system; only 12 of 329 Midway students ride buses. In contrast, the overwhelming majority of students in the schools that have opened for the first time since entry of the consent decree ride buses. Of these 14 new schools, 12 have the majority of their students bused. The newest elementary school, Woodlands, has 504 of 536 students bused. The newest middle school, Tuskawilla, has 1182 of 1189 students bused. The newest high school, Lake Howell, has 1201 of 1342 students bused. The county buses 7200 elementary students, over half the elementary school population. It buses 19,400 (61%) of its students at all levels. Over 17,000 students ride buses more than two miles.

At any rate, the Board concedes the continuing vitality of *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), in which the Supreme Court approved the use of busing as a tool for dismantling dual school systems.

410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973) (*Ellis II*).

### IV.

In summary, by consenting to the decree in 1970 the Board admitted the original constitutional violation. Our cases make clear that the acknowledged system-wide violation required system-wide relief. No cognizable barriers prevented integration of Midway, and the failure of the original plan to produce the intended result therefore entitled the Government to additional relief. Seminole County's intervening record has fallen far short of establishing a unitary system. The Government thus remains entitled to further relief. We reverse the district court's denial of relief and remand for entry of an appropriate remedy ending the segregation of Midway Elementary School. *See Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142 (5th Cir. 1972) (en banc), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041 (1973).

REVERSED AND REMANDED.