Eddie Mitchell **TASBY**, et al.,
Plaintiffs,

v.

Dr. Linus **WRIGHT**, General Superintendent, Dallas Independent School District, et al., Defendants.

Civ. A. No. 3–4211–H.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 3, 1986.

Edward B. Cloutman, III, Mullinax, Wells, Baab, Cloutman & Chapman, Dallas, Tex., for plaintiffs.

E. Brice Cunningham, Donald W. Hicks, Hill, Hicks, Collins & Joyner, Dallas, Tex., for intervenor Black Coalition to Maximize Educ.

Robert H. Thomas, Strasburger & Price, Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

SANDERS, District Judge.

On January 21–23, 1986, the Court held a hearing on *A Plan for the Development and Implementation of Educational Centers in West Dallas Grades 4–6* ("Plan" or "West Dallas Plan") filed December 26, 1985, by Defendants Dallas Independent School District, et al. ("DISD" or "District"), and the responsive pleadings of Plaintiffs Tasby and Intervenor Black Coalition to Maximize Education ("Coalition"). The December 26 Plan superseded similar plans filed by the District in the weeks previous to that date.

DISD proposes to establish West Dallas Education Centers for grades 4–6 to provide special remedial education for approximately 1500 West Dallas 4–6 students who are now being bused to eight North Dallas 4–6 Centers under a 1976 decree of this Court. The District will provide transportation to West Dallas students who wish to continue to attend the North Dallas Centers.

### Background

The Dallas Independent School District has been mired in school desegregation litigation since 1955.[1] This suit was filed in 1970 when the District had a majority (58%) anglo student population.[2] The busing routes which the District now seeks to change were ordered by Judge Taylor of this Court in 1976; the routes were not based upon any time/distance studies.[3]

The changes in the racial composition of the School District since 1970, and since the 1976 decree, have been dramatic:

—in 1976, the District had 139,036 students of whom 39% were anglo, and 61% were black, hispanic, and American Indian and Asian; by 1985, the student population had decreased to 130,784 (21.8% anglo, 49.3% black, 26.3% hispanic, and 2.2% American Indian and Asian)[4]—

—in 1976 the District had 30,870 students in grades 4–6 (35.3% anglo, 48.2% black, 15.7% hispanic, and 0.8% American Indian and Asian); by 1985, the 4–6 student population had changed only slightly in terms of numbers but substantially in terms of racial composition (26.8% anglo, 50.2% black, 21.4% hispanic, and 1.6% American Indian and Asian)[5]—

—The change since 1976 in the racial composition of the eight North Dallas 4–6 Centers which are affected by the

---

1. *Tasby v. Wright*, 520 F.Supp. 683, 687 (N.D. Tex.1981), *affirmed in part, reversed in part, Tasby v. Wright*, 713 F.2d 90 (5th Cir.1983).

2. *Tasby*, 520 F.Supp. at 693 (1970 student population was 58.2% anglo, 33.4% black, and 8.4% hispanic).

3. *Tasby v. Estes*, 412 F.Supp. 1192, 1214, *remanded Tasby v. Estes*, 572 F.2d 1010, 1014 (5th Cir.1978), *cert. dismissed*, 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980).

4. Attachment A.

5. *Id.*

West Dallas Plan [6] has been significant. In 1976 the eight Centers were desegregated by busing West Dallas students to them; in 1985 only two of the Centers (Pershing and Walnut Hill) could be considered desegregated.[7]

In its February 1, 1982 Judgment, this Court directed DISD to review the 4–8 transportation established in 1976 to determine if revisions should be made "without adversely affecting the present degree of desegregation".[8] From this directive came the three South Dallas Education Centers approved by this Court and by the Fifth Circuit.[9]

In early 1985 the School District, again responding to the Court's directive, advanced a proposal for West Dallas Education Centers modeled on the South Dallas Centers. After a hearing the proposal was denied without prejudice, in light of the pending appeal on the South Dallas Centers and insufficient experience at those Centers upon which the Court might draw. Memorandum Opinion and Order filed April 23, 1985.

With the South Dallas Education Centers having received Circuit approval and the 1984–85 school year experience available, the District once again seeks to establish West Dallas Education Centers, with emphasis on bilingual education because of the many hispanic students in the West Dallas area. Plan, Figure 1.3. Students in grades 4–6 from six West Dallas attendance zones [10] would be allowed to return to West Dallas for remedial education courses in four Education Centers.[11] For those who wish to remain in their present North Dallas Centers, the District will provide transportation; West Dallas students could also participate in the district-wide Majority-to-Minority (M/M) and curriculum transfer programs.[12]

Fourteen hundred eighty-four (1484) West Dallas students attend the eight North Dallas Centers: [13]

| Sending West Dallas School | No. Students Sent | Receiving North Dallas School |
|---|---|---|
| Carr | 195 | Burnett |
| Carr | 80 | Foster |
| Gabe Allen | 228 | Caillet |
| Gabe Allen | 240 | Marcus |
| Earhart | 104 | Field |
| Carver | 125 | Preston Hollow |
| Navarro | 299 | Walnut Hill |
| Tyler | 115 | Preston Hollow |
| Tyler | 168 | Pershing |
| TOTAL | 1484 | |

Defendants' Exhibit 18.

Daily round trips for these students range from 40 minutes to 60 minutes. Plan, Figure 1.5.[14]

### Governing Principles

The basic principles which guide a district court in school desegregation litigation are well established:

6. Burnet, Caillet, Field, Foster, Pershing, Preston Hollow, Marcus and Walnut Hill. Plan, Figures 1.1, 1.3. Webster testimony.

7. See Attachment A. See Tasby, 520 F.Supp. at 711: "75%–25%, anglos to minorities or minorities to anglos [is] a proper definition of a desegregated setting for a school within DISD". This definition has not since been disputed or disturbed, see Tasby, 713 F.2d at 97, n. 10; it is accepted by the parties, see e.g., Coalition Proposed Findings and Conclusions filed December 12, 1985. The Court regards the 75%–25% standard as the law of the case.

8. Tasby v. Wright, 542 F.Supp. 134, 142.

9. Tasby v. Wright, 585 F.Supp. 453 (1984), affirmed sub nom., Tasby v. Black Coalition, 771 F.2d 849 (5th Cir.1985). Those Centers had start-up problems, due primarily to the short time between approval (April 30, 1984) and opening (August 1984); those closely involved in their operation believe that the Centers are working well. Testimony of the three Centers' principals (Louise Smith, W. Williams, D. Williams).

10. Gabe Allen, Earhart, Carver, Navarro, Tyler, and Carr. Plan, Figure 1.1.

11. Carver, Earhart, Sequoyah and Edison/Gabe Allen. Plan, Figure 1.3.

12. Plan, 3.7, 11.3; Webster and Cotton testimony.

13. Currently, 7015 DISD students in grades 4–8 are bused for desegregation—3170 in 4–6 and 3845 in 7–8.

14. See Tasby, 520 F.Supp. at 726 ("no more than 30 minutes in the aggregate should be spent by [K–3] students for transportation purposes").

—every previously segregated school system has a continuing affirmative duty to bring about "the maximum desegregation practically achievable"; [15]—

—the purpose of a school desegregation plan is to provide remedies which will make whole the victims of past unlawful racial discrimination; [16] "[t]he objective [is] to eliminate from the public schools all vestiges of state-imposed segregation"; [17]

—the Court must view the School District as a whole and not school-by-school; [18] "racial quotas for student population are not to be instituted"; [19]—

—the District Court has broad powers to establish equitable remedies for school desegregation; [20]—

—the remedies should be designed in the light of the particular circumstances and the options available [21], and should accommodate the interest of school officials in administering a constitutionally adequate school system; [22]—

—remedial education programs may be utilized as part of a school desegregation plan. [23]

All of these principles and cases are built on the foundation of *Brown v. Board of Education*,[24]—that *dejure* racial discrimination in public education is unconstitutional.

**15.** *Swann v. Charlotte Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. New Kent County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; *Davis v. Board of School Commissioners of Mobile County Board of Education,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *United States v. Seminole County School District,* 553 F.2d 992, 995 (5th Cir.1977); *Valley v. Rapides Parish School Board,* 646 F.2d 925 (5th Cir.1981) ("*Rapides I*").

**16.** *Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) ("*Milliken II*"); *Tasby v. Wright,* 520 F.Supp. 683, 705 (N.D.Tex.1981), *aff'd in part, rev'd in part,* 713 F.2d 90 (5th Cir.1983). *See also U.S. v. Columbus (Miss.) School District,* 558 F.2d 228, 231 n. 11 (5th Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 728, 54 L.Ed.2d 757 (1978).

**17.** *Swann,* 402 U.S. at 15, 91 S.Ct. at 1275–76. The time may be approaching when educational difficulties of minority students may have to be attributed to causes (*e.g.,* socio-economic, deficiencies in current educational system) other than yesteryear's defunct and unconstitutional racial segregation. *See Swann,* 402 U.S. at 31–32, 91 S.Ct. at 1283–84; *Keyes v. School District,* 413 U.S. 189, 211, 93 S.Ct. 2686, 2698–99, 37 L.Ed.2d 548 (1973).

**18.** *U.S. v. Board of Education of Valdosta, Georgia,* 576 F.2d 37, 39 (5th Cir.), *cert. denied,* 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978); *Lee v. Tuscaloosa City School System,* 576 F.2d 39, 41 (5th Cir.1978); *Carr v. Montgomery County Board,* 377 F.Supp. 1123 (M.D.Ala.1974), *aff'd* 511 F.2d 1374 (5th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975); *Rapides I, supra.*

**19.** *Carr, supra,* 377 F.Supp. at 1133; *see also Swann,* 402 U.S. at 24, 91 S.Ct. at 1280.

**20.** *Swann,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; *United States v. Crucial,* 722 F.2d 1182, 1188 (5th Cir.1983); *Valley v. Rapides Parish School Board,* 702 F.2d 1221, 1225 (5th Cir.), *rehearing denied,* 705 F.2d 112, *cert. denied,* 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983) ("*Rapides II*") ; *see also Brown v. Board of Education,* 349 U.S. 294, 299, 75 S.Ct. 753, 755–56, 99 L.Ed. 1083 (1955) ("*Brown II*").

**21.** *Green,* 391 U.S. at 439, 88 S.Ct. at 1694–95; *Milliken II,* 433 U.S. at 287, 97 S.Ct. at 2760–61; *U.S. v. Crucial,* 722 F.2d at 1186–87; *Ross v. Houston I.S.D.,* 699 F.2d 218, 227 (5th Cir.1983); *Ross v. Eckels,* 434 F.2d 1140, 1147 (5th Cir. 1970) (per curiam), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1614, 29 L.Ed.2d 123 (1971). *See also Davis v. East Baton Rouge Parish School Board,* 721 F.2d 1425, 1437 (5th Cir.1983); *Rapides II,* 702 F.2d at 1226.

**22.** *Milliken II,* 433 U.S. at 281, 97 S.Ct. at 2757–58; *Rapides II,* 702 F.2d at 1226.

**23.** *Tasby v. Wright,* 585 F.Supp. 453 (N.D.Tex. 1984), *aff'd sub. nom., Tasby v. Black Coalition,* 771 F.2d 849 (5th Cir.1985). *See also Milliken II, supra; United States v. Jefferson County Board of Education,* 380 F.2d 385 (5th Cir.1967), *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); *Plaquemines Parish School Board v. United States,* 415 F.2d 817, 831 (5th Cir.1969). *See also Tasby,* 585 F.Supp. at 456 n. 10.

**24.** 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("*Brown I*"); *Brown II, supra,* 349 U.S. 294, 75 S.Ct. 753.

*The West Dallas Plan*

The District proposes creation of four West Dallas Centers for remedial education for pupils in grades 4–6. Students from six West Dallas attendance zones will attend these Centers instead of the eight North Dallas schools to which they are now bused, unless they choose to remain at the North Dallas schools.

The District has submitted an extensive Plan for Development and Implementation of the Centers ("the Plan"), filed December 26, 1985, Defendants' Exhibit 3, as well as a series of Evaluation Questions, Defendants' 14. The central features of the Plan are (numbers refer to sections in the Plan):

(a) a reduced pupil-teacher ratio of 18:1, with a cap of 20:1 (6.1);

(b) an extended school day (8:00 a.m. to 3:45 p.m.), which adds 45 minutes to each day (5.3);

(c) extensive voluntary before-school and after-school programs (5.3);

(d) increased pay for teachers (6.1, 12.0);

(e) specially selected and trained teachers and administrators (6.2, 6.3, 6.4, 6.5, 8);

(f) extensive bilingual programs at Edison/Gabe Allen and ESL programs at the other Centers (5.2.6, 5.2.7);

(g) a continuing commitment to spend $3,172,033 annually in addition to the standard allocations for the West Dallas students (14.0, Fridia testimony);

(h) an extensive program of monitoring of both compliance with the Plan and the District's progress in meeting achievement goals (Evaluation Questions; 13.0);

(i) achievement goals for mathematics, language, science, and social studies (2, 5); and

(j) curriculum enhancements in all major areas (5).[25]

The Plan also specifically provides for free transportation for those students who wish to remain in their current North Dallas assignments, 3.7, 11.3, in addition to any other transportation programs for which the West Dallas students might be eligible. Fridia testimony.

The commitment to a greatly reduced class size goes well beyond the requirements of state law. A teacher-pupil ratio of 1:27 is currently required for grades 4–6; in the 1986–87 school year a 1:22 ratio will be required for grade 4, but not grades 5 or 6. Fridia and Gutierrez testimony. When attendance patterns are considered, the District's 1:18 commitment is likely to result in an average daily class size of fourteen. Fridia testimony. Since low teacher-pupil ratios are particularly important to economically disadvantaged children's ability to learn, Gutierrez testimony, the reduced teacher-pupil ratio alone represents a major step forward in addressing the educational needs of West Dallas students. D. Williams testimony.

West Dallas students will not only have smaller classes, but will spend more time in their classes than other DISD 4–6 students. The school day is extended 45 minutes and the Centers are open both earlier and later than regular schools. Students' time in class is also increased because there will be less need to pull students out of regular classes for special instruction, tutoring, or enrichment programs, since those activities will now take place during the extended hours. Reducing "pull outs" improves both learning and achievement test performance and is one of the steps the District has proposed based on its experience with the South Dallas Centers.[26] D. Williams testimony.

**25.** The goals include: (1) a 10% increase in the number of students functioning at or above the 30th and 50th percentiles, Iowa Test of Basic Skills (ITBS), annually until 85% of West Dallas students assigned to each Center score above the 30th and 50th percentiles, in reading, mathematics, and language; and (2) the number of students passing the District's criterion-referenced survey test in reading, mathematics, science, and social studies will increase by 5% over the base year (1986). 2.1.2, 2.1.3, 2.1.4, 2.1.6. The West Dallas Centers' goals cover more subjects than those currently in place in South Dallas, where only reading was included.

**26.** The extended day will also allow more students to participate in extra curricular activities; this participation has been found to improve

The District has improved the teacher recruitment process in light of its admitted shortfalls in South Dallas; West Dallas teachers will receive, in addition to extra pay for extra hours worked during school and in training, a bonus of $1500 at the beginning of the first school year, and an additional bonus for each year each Center meets the Plans' goals. This incentive has already generated considerable interest within the District. Bell testimony.

West Dallas Center teachers will not only be better paid and better trained, they must have a demonstrated sensitivity to the needs of minority students. This sensitivity will be evaluated through review of personnel files, past performance in minority environments, principal's evaluations, and previous internal transfer requests. Bell testimony.

Although both share common elements, the curriculum at the West Dallas Centers differs significantly from the District-wide 4–6 program. Classes at the West Dallas Centers will be taught on a departmentalized basis, rather than as self-contained classes as in South Dallas and DISD 4–6 Centers generally. Gutierrez testimony. The District contends that this will allow a greater consistency of teaching among subject areas by concentrating teachers in their strongest areas. Gutierrez testimony. Even the Plan's harshest critics agree that departmentalization will be beneficial. Gilliam testimony.

A number of enhancements are proposed for individual subject areas: science classes will all have their own laboratory equipment, rather than sharing portable units; language arts classes will provide increased individual instruction, and an emphasis on oral development; musical instruments will be provided free of charge for Fine Arts Program participants; and math classes will be augmented with both computer laboratories and Project SEED, a na-

tionally recognized remedial math program.[27] Gutierrez testimony.

High achieving students will benefit from an extended Talented and Gifted (TAG) program which will admit students from the 60th percentile and above instead of being restricted to the 80th percentile and above, as it is elsewhere in the District. Gutierrez testimony. The extension of TAG has been found to be a useful means of both preventing slippage of high achievers' performance and as a means of building academic self confidence. D. Williams testimony. The District is committed to implement its successful "a priori" reading program, currently in use in the District's Chapter I and programmatic remedy schools, at these Centers. Bell testimony. The District also proposes additional hispanic and black studies programs over and above those in use District-wide. *Id.*

The Plan includes a new approach to bilingual education, a Bilingual Immersion Program ("BIP"). The BIP is a structured approach to bilingual education, which provides Limited English Proficiency ("LEP") students with sheltered homogeneous classes in substantive subject areas and a primary language class in cognitive skills. Apodaca testimony. As students progress in English proficiency, they are gradually moved into mainstream substantive classes. Plan, Appendix C.

Because a cost-effective BIP requires large numbers of Limited English Proficiency students, ESL programs will be provided at the three Centers with the smaller LEP populations (Carver, Earhart, Sequoyah), with the option of a curriculum transfer to the BIP Center. Apodaca testimony.

Importantly, the District is committed to develop a Plan of Implementation for the West Dallas Centers before the Centers open; such a plan, together with the proposed Evaluation Questions, Def. Ex. 14, will provide a needed management tool

both achievement levels and discipline. W. Williams testimony.

27. Each West Dallas Center will also have an additional staff member on site to assist staff

and students in using the computer equipment. In fact, each Center will have 21 additional personnel over and above what a regular 4–6 Center has. Bell testimony.

which the South Dallas Centers have lacked. Hood testimony.

### The Opposition to the Plan

Plaintiffs and the Coalition raise several objections to the District's proposal. Both contend that too many unanswered questions remain about the success of the South Dallas Centers. Plaintiffs object to the monitoring methodology proposed by the District to measure progress towards the proposed achievement goals.[28] Plaintiffs also argue that the children from the Gabe Allen attendance area should remain in their current assignments until the new Gabe Allen facility is ready, rather than transferring for one year to the temporary Edison Center as the District proposes.

### Analysis

Analysis of the West Dallas Plan must be preceded with the observation that in this sprawling (351 square miles)[29], predominantly (78.2%) minority school district, the opportunities for meaningful desegregation by student assignment are minimal.[30]

It is a lamentable fact that most of the 1484 West Dallas students attending the eight North Dallas Centers are not receiv-ing a desegregated education. Students from Earhart spend 56 minutes each day on a bus to attend Field in North Dallas, which has a 7.6% anglo enrollment (12 anglo students). Webster testimony; *Attachment A.* Burnett, Caillet, Foster, Preston Hollow and Marcus also have anglo percentages lower than 25%. *Id.* Only the 168 West Dallas students from a part of the Tyler attendance zone who attend Pershing (52 minutes daily on the bus) and those (229) from the Navarro attendance zone who attend Walnut Hill (52 minutes each day on the bus) are attending desegregated schools. *Attachment A.*[31]

■ In the Court's opinion it is pointless to bus minority students from the minority neighborhoods of West Dallas to attend predominantly minority schools in North Dallas; such transportation does not serve a desegregative purpose.[32] The busing which was necessary in 1976 to desegregate a district slow to accept *Brown I* and *Brown II* is not serving a significant desegregative purpose in 1986.[33]

Nor is any desegregative purpose being served by transporting 61 Cabell students (in North Dallas) to Burnett, also in North Dallas. The Cabell students are not receiving a desegregated education at predomi-

---

**28.** Plaintiffs' objection is that by basing the calculation of the goal on the number of students present in the Centers during the second six weeks of the spring semester, the District may be able to meet its goals with fewer improved students than if it based the calculations of the goal on the Center's students, regardless of attendance. *See* Plan 12.2.6 for a numerical example of such a calculation.

**29.** *Tasby,* 520 F.Supp. at 692.

**30.** Anglo student population of the DISD decreased 44% in nine years, from 54,182 in 1976 to 28,479 in 1985. Attachment A. The continuing decrease in the number of anglo students in lower grades foreshadows a continuing decline in anglo students. *See* Report to the Court filed December 16, 1985, at 4 (K–3 students now 20.89% anglo, 45.93% black, 29.30% hispanic, and 2.21% American Indian and Asian).

**31.** The enrollment history of Walnut Hill indicates that it, too, will soon become predominantly minority. In 1976, Walnut Hill had 207 (49.3%) anglo students; it now has 128 (31.1%)

anglos. Only Pershing has the promise of continuing as a desegregated 4–6 Center. From 1976 to 1985 there has been a continuing decrease in the amount of desegregation at all eight North Dallas Centers. *Attachment A.*

**32.** *See Tasby,* 520 F.Supp. at 730.

**33.** The District's attitude toward desegregation has changed greatly in recent years. Found in 1981 to be desegregating in good faith, *Tasby,* 520 F.Supp. at 706, and commended by the Court for "initiative and creativity" in 1984, *Tasby,* 585 F.Supp. at 458, the District in 1985 obtained passage of a $200 million bond issue to improve physical facilities throughout the District. The Court had previously criticized the conditions of the facilities. The District continues to have some difficulties in complying with portions of the Court's February 1, 1982 Judgment. *Tasby,* 542 F.Supp. 134. *See* Reports of External Auditor for years 1982–83, 1983–84, 1984–85, and Memorandum Opinions and Orders relating thereto, *e.g.,* Opinion and Order filed September 10, 1985.

nantly minority Burnett; they will receive a desegregated education in a 4–6 Center in their own attendance zone.[34] *Attachment A;* Webster testimony.

The Court finds that *even without the West Dallas Centers,* the following changes could be made without adversely affecting student assignment desegregation:

—the 275 Carr students who attend Burnett and Foster could be allowed to return to the Carr attendance zone—

—the 468 Gabe Allen students who attend Caillet and Marcus could be allowed to return to the Gabe Allen attendance zone when physical facilities are available—

—the 104 Earhart students who attend Field could be allowed to return to the Earhart attendance zone—

—the 125 Carver students who attend Preston Hollow could be allowed to return to Carver. (The Tyler students would be left at Preston Hollow, making Preston Hollow desegregated.)—

—the 61 Cabell students who attend Burnett could be allowed to return to the Cabell attendance zone.

With these changes seven of nine North Dallas 4–6 Centers would be desegregated [35] where now only two of eight Centers are desegregated.

The above discussion places the proposed West Dallas Plan in perspective. It is against this backdrop that the Court must examine the District's commitment to spend over $3 million annually for special

remedial education for West Dallas 4–6 students at the four West Dallas Education Centers.

The District says, in substance, that it can do more to remove the vestiges of past unlawful segregation by providing remedial education to these students in special Education Centers than by continuing to bus them to North Dallas Centers, six of which are predominantly minority. It is a fact that the West Dallas students are lagging behind their peers in academic performance. The Plan and the evidence adduced at the hearing revealed that the achievement levels of West Dallas minority students are below national norms. Three-quarters of West Dallas Hispanic students and two-thirds of West Dallas black students score below the national norm in reading. Plan, Figure 1.2. Almost sixty percent of both West Dallas blacks and West Dallas hispanics are below the national norm in mathematics. More importantly, there are differences between the performances of West Dallas minorities and minorities in the District as a whole. In mathematics, for example, 15% more hispanics and 11% more blacks score at or above the national norm in the district as a whole than in West Dallas. Similarly, 18% more District wide hispanics scored above the 30th percentile in reading than did West Dallas hispanics. *See generally,* Plan, Figure 1.2.[36]

The District proposes to address these deficiencies through the remedial education detailed in the Plan. The District commits to spend $3,172,033 annually (over and

---

**34.** Gooch is also in North Dallas. Ninety-seven (97) students are bused from the Gooch attendance zone to attend desegregated Pershing and Walnut Hill. Def.Ex. 18. Withdrawal of the Gooch students and the 168 Tyler students from Pershing would not cause Pershing to become predominantly anglo but the racial ratios would significantly change, to 67.9% anglo. If allowed to remain in their own attendance zone, the 97 Gooch students would attend a desegregated (67.9% anglo) 4–6 Center; however, the Tyler students would return to a predominantly minority school in West Dallas.

**35.** —four North Dallas Centers (Caillet, Field, Marcus and Preston Hollow), now predomi-

nantly minority, would become desegregated—

—one new North Dallas 4–6 Center (Cabell) would be desegregated—

—two North Dallas Centers (Burnet and Foster), now predominantly minority, would continue to be predominantly minority—

—two North Dallas Centers (Walnut Hill and Pershing) would continue to be desegregated, with students from West Dallas Tyler and Navarro and North Dallas Gooch.

**36.** Because Figure 1.2 shows differences in population measurements, rather than sample measurements, all of the differences in Figure 1.2 are statistically significant. Webster testimony.

above the standard allocation for 4–6 Centers) to improve education for these West Dallas students, plus a one time start-up cost of $1,990,463. Plan at 39–43. Substantial improvements are being made to the four buildings which will house the four West Dallas Centers, Plan at 30 *et seq.;* all will be ready for occupancy when the 1986–87 school year begins. Cotton testimony. The new Center at Gabe Allen will not be ready until September 1987; the District proposes that the Gabe Allen students attend a temporary Center at Edison in 1986–87.

■ The Court is of the opinion that the Plan offers a probable solution to these educational deficiencies, consistent with the principles of desegregation. The Plan is an impressive *voluntary* commitment by the DISD, which will become *compulsory* upon approval by the Court.

In addition to four West Dallas Centers the District's Plan would yield 10 North Dallas Centers, with improvements in desegregation as follows:

—three (Caillet, Field, Marcus), now predominantly minority, would become desegregated—

—two new desegregated 4–6 Centers (Cabell and Gooch) would be established—

—two (Burnett and Foster) now predominantly minority, would continue as such, with only slight changes in racial composition—

—one (Pershing), now desegregated, would continue as such, but with a higher percentage of anglos—

—two (Walnut Hill and Preston Hollow) would become predominantly anglo.

The Court has already noted that Walnut Hill will soon become predominantly minority, *see* n. 31, *supra.* If the West Dallas Plan is approved, an additional 22 minority students would make Walnut Hill desegregated. Webster testimony. Preston Hollow is now predominantly minority. If the Plan is approved, the addition of 19 minority students would desegregate Preston Hollow. *Id.* Reopening Preston Hollow to Majority-to-Minority (M/M) and curriculum transfers (it has previously been closed to such transfers) would likely bring 19 or more additional minority students to Preston Hollow.[37]

The District stresses, and the Court emphasizes, that under the Plan all West Dallas 4–6 students will be eligible to remain in their present North Dallas Centers, with transportation provided by the District, and will additionally have the M/M and curriculum transfer opportunities provided to other DISD students. Fridia and Cotton testimony.[38]

Evidence was adduced regarding problems at the South Dallas Centers. Plaintiffs and the Coalition argue, in substance, that experience at these Centers demonstrates either that the concept of Education Centers is unsound or that there is still insufficient experience with these Centers for the Court to now approve similar Centers for West Dallas. The Court finds that the problems encountered in the first (1984–85) school year at the South Dallas Centers were primarily due to the lack of sufficient time to plan the Centers' operations. (The Court approved the Centers

---

**37.** Webster testimony. Preston Hollow has historically experienced a much higher rate of M/M transfers than the DISD average. In 1984–85, more than 60 minority students transferred to Preston Hollow. In 1985–86 this number dropped sharply because of space limitations. *Id.* With the increased openings possible once the Carver and Tyler students have returned to the West Dallas Centers, the racial balance at Preston Hollow is likely to be favorably affected by M/M transfers.

**38.** Transfer opportunities for the West Dallas students will be enhanced by the District's commitment to provide DISD bus service for groups of five or more West Dallas students, rather than the ten or more required District wide. Cotton testimony. This commitment is made subject only to Court approval of minor modifications in bus routes to allow the most cost-efficient use of buses. The West Dallas students and their parents will be provided counseling regarding their right to remain at their current North Dallas Centers.

April 30, 1984 and the Centers opened in August 1984.) The principal consequences of this lack of time were the shortages of supplies [39] and the failure to meet teacher recruitment goals in South Dallas during the first year of operation. D. Williams, W. Williams, Smith, and Gilliam testimony. The District will have almost three more months to plan for three of the West Dallas Centers (Earhart, Carver, Sequoyah) than it had for the South Dallas Centers, and more than 18 months to plan for the fourth (Gabe Allen). The District's experience in South Dallas should enable it to use this time more effectively.

The District has also anticipated the possibility that it has underestimated the number of students who will enroll, as it did in South Dallas, by including a ten percent safety factor in its projected enrollments for the West Dallas Centers. Fridia testimony.

The District has drawn from its experience in South Dallas in developing the West Dallas Plan.[40] In consultation with the External Auditor the District has developed Evaluation Questions for the West Dallas Centers, Def. Ex. 14, based upon the experience in South Dallas. This Evaluation will provide accountability and enable the Court to discern whether the Plan is being implemented as ordered. The question is not whether the South Dallas Centers are "perfected" in every respect; rather, the question is whether the South Dallas Center experience is sufficient for planning and operating West Dallas Centers; the Court finds that it is, indeed, sufficient.

Court approval will give the West Dallas Plan the force of a court order; the Court will stand as guarantor of the Plan's commitments, with the obligation and power to order improvements, including additional

expenditures if needed—and the Court intends to exercise that power.

The Court finds that the District has provided an adequate explanation of the change in methodology for calculating achievement goals. The need to provide staff with an identifiable goal, particularly when incentive pay is dependent on meeting the goals, Bell testimony, and the understandable desire to limit the measurements to those students who have been in the program long enough to have benefited, Webster testimony, justify the change.[41] The proposed change will therefore be approved.

However, the Court shares Plaintiffs' concern that more "realistic" goals not become camouflage for lowered goals. The District is therefore directed to provide the External Auditor with the data necessary to determine the District's progress under both the proposed method and the South Dallas, or Plaintiffs', method. If any significant discrepancies develop, the Court may order a revision in the methodology.

The Court understands that the District has a revised Plan of Implementation for the South Dallas Centers. That Plan should be submitted promptly. All of the South Dallas problems pointed out have been remedied or are remediable; they must be avoided in West Dallas. By the end of this school year the Court will be able to evaluate two years of operation of the South Dallas Centers; the Court will require the District to make such additional improvements as may appear necessary in light of the evaluation. However, it would not be correct to maintain that the South Dallas Centers have been failures to date. Real gains in achievement scores have been made; testimony reflected, and the Court finds, that in most respects the three Cen-

---

**39.** Some of the shortages were the result of a district-wide text book shortage and not limited to the South Dallas Centers. Fridia testimony. Shortages of library books at Anderson, however, continue, Young testimony, and must be promptly remedied.

**40.** Fridia, Webster, Gutierrez, and Hood testimony.

**41.** Plaintiffs' concern is at least partially obviated by the possibility that an increase in Center enrollment may result in the District's goal be-

ters are succeeding.[42] The Court is compelled to observe that achievement scores are not the only measure of success; they should not supplant or interfere with the first obligation of the Education Centers, which is to *teach students.*

■ The Court finds that the small class sizes, the emphasis on skilled teachers and specially trained administrators, and the longer school day, together with the other benefits detailed in the West Dallas Plan, are more likely to benefit desegregation than the present busing to North Dallas 4–6 Centers.

The Court has given particular consideration to the testimony of Ms. Gilliam and Mr. Medrano, minority members of the DISD Board of Education who oppose the Plan.[43] Both oppose creation of the West Dallas Centers at this time because the South Dallas Centers have not been "perfected" and because of insufficient experience with those Centers. The Court has already addressed those arguments. Suffice it to say, the Court believes that the South Dallas shortcomings can be avoided with the additional planning time which West Dallas will have before the commencement of the next school year. Perfection of the South Dallas Centers is surely a goal, but for purposes of considering West Dallas Centers the Court only needs to be satisfied that the South Dallas Centers are progressing well and that the difficulties encountered with them can be avoided in West Dallas.[44] The Court is so satisfied.

■ Mrs. Gilliam's testimony reflected her opinion that bused minority students are not being treated fairly (*i.e.*, there is hostility and some resegregation) at the receiving schools. The Court is mindful of Mrs. Gilliam's tireless efforts in behalf of the black community during her many years on the Board of Education. But the admissible evidence before the Court provides no factual support for her opinion. The Annual Reports of the External Auditor (which are thorough and objective) make no reference to unfairness (or to hostility or resegregation) toward minority students at the receiving schools; no evidence of such treatment has ever been presented to the Court in any proceeding in this case. The Court finds that the contention is without merit. Even if the charge were supported, it is not an argument against the West Dallas Centers, and could be construed as an argument in favor of such Centers.[45]

The Court is of the opinion that it would not serve the cause of desegregation, or the best interest of the West Dallas children, to reject the opportunities which the West Dallas Plan offers, particularly since, for most of these students, no desegregation awaits them at the end of their current bus rides.

■ Mr. Medrano also opposes the proposed two transfers of the Gabe Allen students—from Marcus and Caillet to a temporary Center at Edison for the 1986–87 school year, and then to a new Gabe Allen Education Center for the 1987–88 school year. Cotton testimony. The Court agrees. Edison is in an industrial area; the Gabe Allen students would have a 26 minute daily bus ride to and from Edison; the contemplated two moves would "not be easy on a child", Apodaca testimony, and would be "disruptive" of their educational progress. Bell testimony. Mr. Medrano

ing set higher than under the South Dallas method.

**42.** Testimony of the principals of the three Centers (Louise Smith, Don Williams, Wilbur Williams).

**43.** All other Board members, including the other minority Board member, voted to approve the Plan. Clegg testimony. Mr. Medrano supported West Dallas Centers in 1985; he still

believes they are a "good concept". Medrano testimony.

**44.** *See* Fridia, Hood, D. Williams, Cotton, Harris, and Hampton testimony.

**45.** Mrs. Gilliam had no recommendations to improve the lagging achievement of the West Dallas 4–6 students. In years past she has opposed busing for desegregation. *Tasby,* 520 F.Supp. at 732.

testified that Gabe Allen parents are opposed to the two moves; such resistance might adversely affect the success of the planned bilingual programs at Edison. Apodaca testimony. Improved bilingual programs can be developed for these Gabe Allen students at their present receiving schools, Marcus and Caillet, while they await the construction of the Gabe Allen Center. Apodaca testimony. Such programs will not, however, offer all the advantages which will be provided in an Educational Center which emphasizes bilingual instruction. *Id.*

The Court finds that the disadvantage of temporarily relocating the Gabe Allen students at Edison outweighs the advantages of such a move. Additionally, deferring this fourth Center until the Gabe Allen Education Center is ready will enable the District to concentrate its efforts on three West Dallas Centers, rather than four, for the 1986–87 school year.

Accordingly, the proposed temporary Education Center at Edison is disapproved. Such Center is approved for the Gabe Allen area, and the Court expects the District to make every effort to have it ready for the 1987–88 school year. *See* Cotton testimony.

The Court finds that the proposed bilingual programs which are detailed in the Plan and supported by the testimony of Ms. Apodaca have been carefully considered and will be beneficial. These programs will alleviate the serious problem of hispanic students dropping out of school and, by concentrating students, reduce somewhat the needed number of bilingual teachers, of whom there is an "acute shortage" throughout the country. Apodaca testimony.

### Summary

The Court, then, has these choices:

1. Reject the West Dallas Plan and leave the present busing patterns in effect.

2. Reject the Plan but allow West Dallas students from Carr, Gabe Allen, Carver and Earhart to return to regular 4–6 Centers in their respective West Dallas K–3 attendance zones, conditioned upon adequate physical facilities being available and adequate transportation being available for those students to remain in the North Dallas Centers they now attend if they so wish.

3. Delay West Dallas Centers for an indefinite period pending further experience with the South Dallas Centers.

4. Approve the West Dallas Plan as submitted.

5. Approve the Plan but delay return of the Gabe Allen students until a new Gabe Allen Center is available, presumably for the 1987–88 school year. The Court believes that this is the best course.

The Court is of the opinion that the West Dallas Education Centers will not adversely affect, but will benefit, desegregation in the DISD. Accordingly, the Centers will be approved as set forth in this Opinion, with the following additional provisions:

1. The Gabe Allen students will remain in the current busing program until the 4–6 Gabe Allen Center is available. The District will make quarterly reports to the External Auditor beginning June 1, 1986, regarding progress in readying that Center. That Center must provide the Gabe Allen students the same programs and benefits as are scheduled for them at Edison under the Plan.

2. The District will file within 7 days a revised timelines schedule. *See* Plan at 25–26.

3. If it appears that any timeline will not be met, the District must report that fact to the External Auditor promptly, and in any event, not later than 7 days before the scheduled timeline date, with an explanation. While all timelines are important, the Court stresses the special necessity of complying with the timelines for selecting teachers and ordering supplies, materials and equipment. Non-

compliance with these provisions would be of particular concern to the Court and might result in the imposition of financial penalties on those responsible.

4. The External Auditor will include in his Annual Report a report and analysis of the results of the evaluation questions, Def. Ex. 14.

5. By noon, *March 10, 1986,* the District should file with the Court the proposed plan for the Continuing Development and Implementation of Educational Centers in South Dallas, Def. Ex. 4, approved by the Board of Education.

## *Conclusion*

In approving the West Dallas Plan the Court breaks no new ground in desegregation law, nor does it minimize the importance of feasible transportation of students in a school desegregation plan. Rather, the Court substitutes a meaningful remedy for one that has become essentially meaningless, in order to bring about "the maximum desegregation practically achievable" in the Dallas Independent School District.

The West Dallas Plan is APPROVED as provided herein.

SO ORDERED.

## ATTACHMENT A

NORTH DALLAS 4-6 CENTERS

| | | 1976 (1) ANGLO | BLACK | HISPANIC | OTHER | TOTAL | 1981 (2) ANGLO | BLACK | HISPANIC | OTHER | TOTAL | 1985 (3) ANGLO | BLACK | HISPANIC | OTHER | TOTAL | PROPOSAL (4) ANGLO | BLACK | HISPANIC | OTHER | TOTAL | ROUND TRIP BUS TIMES (min) (5) | WEST DALLAS ATTENDANCE ZONES (6) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Burnet | number | 362 | 356 | 108 | 13 | 839 | 193 | 296 | 119 | 15 | 623 | 103 | 248 | 213 | 9 | 573 | 63 | 100 | 193 | 6 | 362 | 42 | Carr, Cabell |
| | % | 43.1 | 42.4 | 12.9 | 1.5 | | 31.0 | 47.5 | 19.1 | 2.4 | | 18.0 | 43.3 | 37.2 | 1.6 | | 17.4 | 27.5 | 53.2 | 1.9 | | | |
| Cabell | number | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 59 | 20 | 19 | 4 | 102 | — | — |
| | % | — | — | — | — | | — | — | — | — | | — | — | — | — | | 57.8 | 19.6 | 18.6 | 3.9 | | | |
| Caillet | number | 204 | 98 | 196 | 4 | 502 | 139 | 106 | 243 | 12 | 500 | 99 | 69 | 231 | 22 | 421 | 94 | 9 | 39 | 9 | 151 | 50 | Gabe Allen |
| | % | 40.6 | 19.5 | 39.0 | 0.8 | | 27.8 | 21.2 | 48.6 | 2.4 | | 23.5 | 16.4 | 54.9 | 5.2 | | 62.3 | 6 | 25.8 | 5.9 | | | |
| Field | number | 54 | 12 | 21 | 1 | 88 | 31 | 9 | 17 | 10 | 67 | 12 | 89 | 43 | 13 | 157 | 17 | 8 | 20 | 19 | 64 | 56 | Earhart |
| | % | 61.4 | 13.6 | 23.9 | 1.1 | | 46.3 | 13.4 | 25.4 | 14.9 | | 7.6 | 56.7 | 27.4 | 8.3 | | 26.6 | 12.5 | 31.3 | 29.6 | | | |
| Foster | number | 244 | 103 | 239 | 7 | 598 | 136 | 118 | 239 | 22 | 515 | 52 | 61 | 151 | 4 | 288 | 53 | 29 | 138 | 3 | 223 | 69 | Carr |
| | % | 41.1 | 17.4 | 40.3 | 1.2 | | 25.4 | 22.9 | 46.4 | 4.3 | | 19.4 | 22.8 | 56.3 | 1.5 | | 23.8 | 13 | 61.9 | 1.3 | | | |
| Pershing | number | 216 | 265 | 23 | 2 | 506 | 107 | 137 | 7 | 6 | 257 | 139 | 171 | 33 | 34 | 377 | 91 | 25 | 13 | 5 | 134 | 52 | Tyler |
| | % | 42.7 | 52.4 | 4.5 | 0.4 | | 41.6 | 53.3 | 2.7 | 2.3 | | 36.9 | 45.4 | 8.8 | 9.0 | | 67.9 | 18.7 | 9.7 | 3.7 | | | |
| Preston Hollow | number | 103 | 70 | 116 | 4 | 293 | 83 | 56 | 66 | 8 | 213 | 83 | 243 | 24 | 11 | 361 | 102 | 10 | 5 | 0 | 117 | 56 | Carver, Navarro |
| | % | 35.2 | 23.9 | 39.6 | 1.4 | | 39.0 | 26.3 | 31.0 | 3.8 | | 23.0 | 67.3 | 6.6 | 3.0 | | 87.2 | 8.5 | 4.3 | 0.0 | | | |
| Walnut Hill | number | 207 | 187 | 25 | 1 | 420 | 131 | 187 | 28 | 8 | 354 | 128 | 237 | 34 | 13 | 412 | 87 | 2 | 9 | 5 | 103 | 52 | Navarro |
| | % | 49.3 | 44.5 | 6.0 | 0.2 | | 37.0 | 52.8 | 7.9 | 2.3 | | 31.1 | 57.5 | 8.3 | 3.2 | | 84.5 | 1.9 | 8.7 | 4.9 | | | |
| Gooch | number | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 95 | 25 | 10 | 10 | 140 | — | — |
| | % | — | — | — | — | | — | — | — | — | | — | — | — | — | | 67.9 | 17.9 | 7.1 | 7.1 | | | |
| Marcus | number | 134 | 23 | 245 | 13 | 415 | 117 | 49 | 259 | 15 | 440 | 85 | 49 | 300 | 14 | 448 | 96 | 44 | 71 | 13 | 224 | 40 | Gabe Allen |
| | % | 32.3 | 5.5 | 59.0 | 3.1 | | 26.6 | 11.1 | 58.9 | 3.4 | | 19.0 | 10.9 | 67.0 | 3.1 | | 42.9 | 19.6 | 31.7 | 5.8 | | | |
| DISD 4-6 | number | 10909 | 14574 | 4844 | 243 | 30570 | 8082 | 15057 | 6408 | 473 | 29970 | 6025 | 14128 | 8642 | 648 | 29443 | — | — | — | — | — | | |
| | % | 35.3 | 48.2 | 15.7 | 0.8 | | 26.8 | 50.2 | 21.4 | 1.6 | | 20.5 | 48.0 | 29.4 | 2.2 | | — | — | — | — | | | |
| DISD K-12 | number | 54182 | 64325 | 19471 | 1058 | 139036 | 35340 | 63337 | 26383 | 2056 | 127116 | 28479 | 64518 | 34868 | 2919 | 139784 | — | — | — | — | — | | |
| | % | 39.0 | 46.3 | 14.0 | 0.8 | | 27.8 | 49.8 | 20.8 | 1.6 | | 21.8 | 49.3 | 26.7 | 2.2 | | — | — | — | — | | | |

NOTES

(1) SOURCE: Report to the Court of the Dallas Independent School District, Appendix A, filed December 15, 1976.
(2) SOURCE: Report to the Court of the Dallas Independent School District, Appendix A, filed December 10, 1981.
(3) SOURCE: Report to the Court of the Dallas Independent School District, Appendix A, filed December 16, 1985
(4) SOURCE: Webster Testimony; Plan, Figure 1.4.
(5) SOURCE: Plan, Figure 1.5.
(6) SOURCE: Plan, Figure 1.1.