Eddie Mitchell TASBY, et al., Plaintiffs,

v.

Chad WOOLERY, General Superintendent, Dallas Independent School District, et al., Defendants.

Civ. A. No. 3–4211–H.

United States District Court,
N.D. Texas,
Dallas Division.

July 26, 1994.

Edward B. Cloutman, III, Dallas, TX, for plaintiffs.

Leonard J. Schwartz, Dallas Independent School Dist., Robert H. Thomas, Strasburger & Price, Dennis J. Eichelbaum, Schwartz & Eichelbaum, Dallas, TX, for defendants.

E. Brice Cunningham, PC, Dallas, TX, for intervenor Black Coalition.

## INDEX

| | | | Page |
|---|---|---|---|
| I. | Background | | 456 |
| | A. | History of Litigation | 456 |
| | B. | Condition of the DISD | 457 |
| | C. | Principles of Law | 458 |
| | D. | The Positions of the Parties | 460 |
| II. | Factors Relevant to Unitary Status | | 460 |
| | A. | Compliance with the Judgment | 460 |
| | | 1. Subdistricts | 460 |
| | | 2. Student Assignment and Attendance Zones | 460 |
| | | 3. Majority to Minority Transfers | 461 |
| | | 4. Curriculum Transfers | 463 |
| | | 5. Magnet Schools | 464 |
| | | a. The Magnet Program | 464 |
| | | b. Honors Programs | 466 |
| | | 6. Regular Schools (Elementary, Intermediate, Middle, and High Schools) and Bilingual Education | 467 |
| | | a. Regular Schools | 467 |
| | | b. Bilingual Education | 467 |
| | | 7. Programmatic Remedies | 468 |
| | | 8. Nolan Estes Plaza | 469 |
| | | 9. Personnel | 469 |
| | | a. Recruitment | 469 |
| | | b. Assignment | 470 |
| | | 1. Teachers | 470 |
| | | 2. Administrators | 471 |
| | | 3. Conclusion Regarding *Singleton* Compliance | 472 |
| | | c. Training | 472 |
| | | 10. Facilities | 472 |
| | | 11. Reporting and Monitoring | 473 |
| | | 12. Other Issues Relevant to Compliance with Court Orders | 473 |
| | | a. Learning Centers | 473 |
| | | b. Allocation of Resources | 474 |
| | | c. Racial Harmony on the School Board | 475 |
| | | d. Future School Boards' Commitment to Desegregation Programs | 475 |
| | B. | Remaining *Green* Factors | 475 |
| | | 1. Transportation | 475 |
| | | 2. Extracurricular Activities | 476 |
| | | 3. Student Achievement | 476 |
| Conclusion | | | 477 |

*MEMORANDUM OPINION AND ORDER*

SANDERS, Chief Judge.

Before the Court is Defendants' Motion for Unitary Status, filed December 17, 1993; Defendants' First Revision to Proposed Amended Judgment and Final Plan for Desegregation, filed January 18, 1994; Plaintiffs' Response, filed January 27, 1994; Intervenor Black Coalition to Maximize Education's Response, filed January 27, 1994; and related pleadings.

### Summary

Subject to the requirements of this Opinion, the Motion for Unitary Status is **GRANTED**.

## I. Background

On May 9, 1994, the Court began a hearing on Defendants' Motion for Unitary Status. The hearing ended on a date with symbolic significance for this case: May 17, 1994, the fortieth anniversary of the Supreme Court decision that banned segregated education, *Brown v. Board of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("Brown I"). *See also Brown v. Board of Educ.,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("Brown II").

■ To obtain unitary status, the District is required to prove that it has complied in good faith with this Court's desegregation orders for a reasonable period of time, and has eliminated the vestiges of prior discrimination to the extent practicable. *See Freeman v. Pitts,* 503 U.S. 467, ——, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992); *Board of Educ. v. Dowell,* 498 U.S. 237, 250, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991). A declaration of unitary status signals the beginning of the end of federal judicial supervision over DISD operations. Before turning to the merits of Defendants' motion, the Court will review the history of this litigation, the present condition of the school district, the legal principles governing the case, and the positions of the parties regarding the motion.

## A. History of the Litigation

The Dallas Independent School District ("the DISD" or "the District") has been embroiled in school desegregation litigation since 1955.[1] Until the Supreme Court's decision in *Brown I, supra,* schools were segregated by law in Texas. In 1955, an action was brought to compel the elimination of racially segregated schools in the DISD. *See Bell v. Rippy,* 133 F.Supp. 811 (N.D.Tex. 1955). A stair-step or grade-a-year desegregation plan was ordered by the federal court in 1960, and a few Black children were admitted to the first grade at previously all Anglo schools in 1961. In 1965, the Fifth Circuit ordered the District to accelerate the desegregation process.

In 1970, most DISD schools were still one-race schools, that is, were comprised of at least 90% Anglo or 90% minority students. This case was filed in 1970 to challenge the segregated system, as evidenced chiefly by the high number of segregated schools in the DISD. *Tasby v. Estes,* 342 F.Supp. 945, 947 (N.D.Tex.1971), *aff'd in part, rev'd in part,* 517 F.2d 92 (5th Cir.1975), *cert. denied,* 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975). At the time, teacher assignment was also premised upon the race of the students. In 1976, the Court (Taylor, J.) directed the District to implement a comprehensive desegregation plan. *Tasby v. Estes,* 412 F.Supp. 1192 (N.D.Tex.1976), *remanded,* 572 F.2d 1010 (5th Cir.1978, *cert. dismissed sub nom., Estes v. Metropolitan Branches of Dallas NAACP,* 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980)). The plan featured magnet schools, a majority to minority transfer program, and a busing program for students in grades 4–8.

Following remand and an extensive evidentiary hearing in 1981, the Court (Sanders, J.) held that additional systemwide transportation was not a feasible remedy. *Tasby v.*

---

1. *See, e.g., Bell v. Rippy,* 133 F.Supp. 811 (N.D.Tex.1955); *Borders v. Rippey,* 184 F.Supp. 402 (N.D.Tex.1960); *Boson v. Rippy,* 285 F.2d 43 (5th Cir.1960); *Britton v. Folsom,* 348 F.2d 158 (5th Cir.1965); *Britton v. Folsom,* 350 F.2d 1022 (5th Cir.1965).

*Wright,* 520 F.Supp. 683, 706–07 (N.D.Tex. 1981), *aff'd in part and rev'd in part,* 713 F.2d 90 (5th Cir.1983). The Court further held that, while vestiges of state-imposed racial segregation remained in the District, effective remedies could be fashioned to overcome the constitutional violation. *Id.* The Court directed the parties to prepare and file desegregation plans for the Court's consideration. *Id.* at 749. Additional desegregation remedies were then ordered by the Court.[2] *Tasby v. Wright,* 542 F.Supp. 134 (N.D.Tex. 1982). The remedies imposed in the 1976 Plan remained in effect.

In 1984, the Court directed the District to open three Learning Centers in South Dallas for grades 4–6. *Tasby v. Wright,* 585 F.Supp. 453 (N.D.Tex.1984), *aff'd, Tasby v. Black Coalition to Maximize Educ.,* 771 F.2d 849 (5th Cir.1985). The Learning Centers returned previously bused minority students to their neighborhood schools, and instituted creative educational remedies to improve the achievement levels of these students. *Id.* at 455–56. In 1986, the Court directed the opening of three additional Learning Centers, in West Dallas. *Tasby v. Wright,* 630 F.Supp. 597 (N.D.Tex.1986). Since then, more Learning Centers have been opened.

Over the years, the Court has held numerous conferences and has issued many decisions in the case. The Court has noted the District's greatly improved attitude toward desegregation. *See, e.g., Tasby,* 630 F.Supp. at 603 n. 33; 412 F.Supp. at 1207; 520 F.Supp. at 683.

## B. Condition of the Dallas Independent School District

The Dallas Independent School District is one of the largest school districts in the nation, both in geographic size and in student enrollment. The District encompasses 351 square miles. *Tasby,* 630 F.Supp. at 603. The DISD served 139,819 students in 1992–93; this impressive number actually represents a decrease in enrollment since 1969–70, when the DISD served 163,268 students. Defs. Ex. 1, Data and Analysis, Table II–1. However, enrollment in the DISD is currently on the rise. (Chad Woolery; William Webster)[3]. Since 1987 the District's tax base has declined and its tax rate has doubled. (Matthew Harden).

The racial composition of the District has changed considerably since this suit was filed. Like other school districts in large cities, the DISD, which was once predominantly Anglo, is now a predominantly Black and Hispanic school district.[4] By 1996 the DISD will become a majority Hispanic school district. (Chad Woolery; William Clark). The limited English proficiency of many of the Hispanic students will continue to present the District with tremendous challenges.

Substantially all of the formerly Anglo schools within the District have been desegregated.[5] Today, only one school in the District, Seagoville Elementary School, has greater than 75% Anglo population; the school is located in the far southeast corner of the county. Defs. Ex. 1, Data and Analysis, App. A, at 368. As the Court noted in 1986, the opportunities for meaningful deseg-

---

**2.** The Judgment uses the following ethnic and racial divisions: Black, Hispanic, and Anglo. The Court retains this terminology in the present opinion for the sake of consistency.

**3.** Throughout the opinion, parenthetical citations signify testimony at the hearing on the motion for unitary status.

**4.** Anglo student enrollment decreased from 59.08% (96,459 students) to 14.78% (20,659 students) between 1969–70 and 1992–93. In contrast, Hispanic student enrollment soared from 8.33% (13,606 students) to 38.16% (53,348 students). Black student enrollment increased from

32.17% (52,531 students) to 44.93% (62,825 students). The Asian and Indian student population also continues to rise. Defs. Ex. 1, Data and Analysis, Table II–1.

**5.** For the purposes of this litigation, the Court has defined a "desegregated" school as a school that has achieved a racial mix of 75%–25% Anglos to minorities or minorities to Anglos. *Tasby,* 520 F.Supp. at 711. This definition has not been disputed or disturbed, *see Tasby,* 713 F.2d at 97 n. 10, and is accepted by the parties. The Court regards the 75%–25% standard as the law of the case. *Tasby,* 630 F.Supp. at 599 n. 7.

regation by student assignment have become minimal. *Tasby,* 630 F.Supp. at 603.

In December 1992, voters passed the most ambitious bond issue in the history of the DISD. The bond projects, which will utilize bond proceeds totalling $275 million, promise to equalize and upgrade facilities for students across the District. The centerpiece of the 1992 bond program is the construction of Townview, a centrally located "supermagnet" that will house six of the District's existing magnet programs in a state-of-the-art facility. Townview is long overdue.[6]

Also included in the bond program is relief of overcrowding at the Fannin, Bonham, and Ray elementary schools. These schools are located in neighborhoods heavily populated with minority students, many of whom are now being bused to other schools in the District. The District plans to build two new schools, and to build an addition to the existing Ray facility, to relieve overcrowding. (Dave Patton). This construction will allow students to return to their neighborhood schools.[7] The District will establish Learning Centers for returning students in grades 4–6 at these schools. (Chad Woolery; Dave Patton). *See* discussion *infra* at section II. A.12.a.

In December 1993, the District provided the Court and the parties with a Bond Project Priority List that contains a schedule for the various new buildings, additions, and renovations included in the bond program. Defs. Ex. 6. Dave Patton, Director of the DISD Bond Program, testified that the District was on schedule with the projects, and did not anticipate any delays. At the request of the Plaintiffs, the District submitted a motion following the unitary status hearing that sought Court approval of the Bond Project Priority List; the Court approved the

schedule. Order dated May 18, 1994. Timely completion of the bond projects should help to assure the minority communities that the DISD has a continuing commitment to quality education for all students.

## C. Principles of Law

To contextualize the legal principles that allow the dissolution of school desegregation decrees, the Court recalls the constitutional rule that justified the remedy. In *Brown I, supra,* the Supreme Court held that government-imposed racial segregation in public schools violated the equal protection clause of the Fourteenth Amendment. *Brown II, supra,* instructed the lower federal courts to accomplish desegregation "with all deliberate speed."

In *Green v. County Sch. Bd.,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), the Supreme Court held that school boards "operating state-compelled dual systems were ... clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." The Court held that a school district has achieved unitary status when it is devoid of racial discrimination with regard to faculty, staff, transportation, extracurricular activities, facilities, and pupil assignment. 391 U.S. at 435, 88 S.Ct. at 1692–93.[8]

In *Milliken II,* the Supreme Court approved the use of remedial education programs as a method of eliminating the effects of prior segregation in a large urban school district with a large minority student population. *Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (*Milliken II* ). This Court has relied heavily

---

**6.** On November 13, 1992, this Court ordered the DISD to construct Townview, and noted that "construction of Townview is a prerequisite to Defendants' attaining unitary status." *Tasby v. Edwards,* 807 F.Supp. 421, 422 (N.D.Tex.1992). That order remains in effect.

**7.** Evidence at the hearing indicated that a final set of students will continue to be bused after the Fannin, Bonham, and Ray relief projects are complete. (Sandra Malone; Kathlyn Gilliam). These students are bused to Franklin Middle

School from the Ray attendance zone. The District professed a willingness to consider options for ending mandatory busing for these students. (Chad Woolery). The Court will require the District to submit a plan to end busing for these students. The return of students to neighborhood schools in the Fannin, Bonham, and Ray attendance zones will end mandatory busing in the DISD.

**8.** For a summary of several other relevant desegregation cases, *see Tasby,* 520 F.Supp. at 701–05.

on *Milliken II* in the desegregation remedies it has ordered.

The Supreme Court has recently revisited the principles of law applicable to a school district's request that a federal court dissolve a desegregation decree. While the traditional inquiry was whether the school district had become "unitary," the Court has now shifted the focus in desegregation cases away from that term.[9]  Thus, in *Dowell*, 498 U.S. at 245, 111 S.Ct. at 636, the Supreme Court wrote, "We think it is a mistake to treat words such as 'dual' and 'unitary' as if they were actually found in the Constitution. The constitutional command of the Fourteenth Amendment is that '[n]o State shall ... deny to any person ... the equal protection of the laws.'" In *Freeman*, 503 U.S. at ——, 112 S.Ct. at 1443, the Court stated,

> The concept of unitariness has been a helpful one in defining the scope of the district court's authority, for it conveys the central idea that a school district that was once a dual system must be examined in all of its facets, both when a remedy is ordered and in the later phases of desegregation when the question is whether the district court's remedial control ought to be modified, lessened, or withdrawn. But ... the term 'unitary' is not a precise concept.... [it] does not confine the discretion and authority of the District Court in a way that departs from traditional equitable principles.

■ The Supreme Court articulated the following test for determining whether a district court may relinquish supervision over the operations of a school district: the district court must determine whether, looking to all facets of school operations, with the *Green* factors as a guide, the school district has complied in good faith with the desegregation decree since it was entered, and has eliminated the vestiges of past discrimination to the extent practicable. *Dowell*, 498 U.S. at 250, 111 S.Ct. at 638; *Freeman*, 503 U.S. at ——, 112 S.Ct. at 1446.

In *Hull v. Quitman Cty. Bd. of Educ.*, 1 F.3d 1450, 1454 (5th Cir.1993), the Fifth Circuit considered the recent Supreme Court decisions:

> This court used to evaluate termination of desegregation decrees under the global inquiry whether the school district had achieved "unitary" status. *Freeman* and *Dowell* make clear, however, that there is no longer magic in the phrase unitary status, which had spawned much uncertainty and a conflict among the circuits. Following *Freeman*, the lower courts have discretion to terminate a desegregation case if a school board has consistently complied with a court decree in good faith and has eliminated the vestiges of past discrimination to the extent "practicable." *Freeman* created a framework in which equitable decrees will not remain in effect perpetually and school districts can be returned to local control.

For other Fifth Circuit cases discussing the law on unitary status, *see Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307 (5th Cir. 1991); *Flax v. Potts*, 915 F.2d 155 (5th Cir. 1990); *United States v. Overton*, 834 F.2d 1171 (5th Cir.1987); *United States v. Lawrence Cty. Sch. Dist.*, 799 F.2d 1031 (5th Cir.1986); *Davis v. East Baton Rouge Parish Sch. Bd.*, 721 F.2d 1425 (5th Cir.1983); *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218 (5th Cir.1983).

■ Finally, the consequences of a declaration by a district court that a school district is unitary must be emphasized. The Fifth Circuit has ruled that a district court should not dismiss a school desegregation case until at least three years after it has declared the system unitary. *Flax*, 915 F.2d at 158 (citing *Youngblood v. Board of Pub. Instruction*, 448 F.2d 770 (5th Cir.1971)). *See also Price*, 945 F.2d at 1311; *Monteilh v. St. Landry Parish School Board*, 848 F.2d 625, 629 (5th Cir. 1988); *Overton,* 834 F.2d at 1175; *Lawrence Cty.*, 799 F.2d at 1037–38; *Ross*, 699 F.2d at 227. During the transition period, the school district continues to report to the district court, and the district court continues to monitor school district operations. *Flax*, 915 F.2d at 163.  Before the district court dis-

---

**9.** *See Dowell*, 498 U.S. at 245, 111 S.Ct. at 635–36, for a discussion of the conflict among the circuits over the meaning of "unitary." *See gen-*erally Symposium, *Desegregation Law: The Changing Vision of Equality in Education*, 42 Emory L.J. 747 (1993).

misses the case at the end of the transition period, it may consider whether the school district has done all that it could to cure any deficiencies. *Id.*

## D. The Positions of the Parties

The District seeks a declaration that the DISD is unitary in all respects. The District has submitted a proposed "Amended Judgment and Final Plan for Desegregation" to govern the case during the three year transition period following a declaration of unitary status.[10] *See* Defendants' First Revision to Proposed Amended Judgment and Final Plan for Desegregation, filed January 18, 1994. Plaintiffs agree that the District is unitary with respect to transportation and extracurricular activities, but only conditionally approve unitary status with respect to student assignment, facilities, faculty, and staff. *See* Plaintiffs' Post–Hearing Findings of Fact and Conclusions of Law, filed June 6, 1994, at 13–14. Intervenor argues that vestiges of the prior segregated school system still remain in the District, and urges the Court to deny unitary status. *See* Intervenor's Corrected Post–Judgment Proposed Findings of Fact and Conclusions of Law, filed June 10, 1994, at 39–40.

It is fair to say, and all parties agree, that the DISD has made enormous progress in providing equal educational opportunities to all students.

## II. Factors Relevant to Unitary Status

■ Keeping in mind the unique facts and circumstances of desegregation in the Dallas Independent School District, the history of this litigation, and guiding legal principles, this Court's task is to determine whether the

DISD has complied in good faith with the desegregation decree for a reasonable period of time, and has eliminated the vestiges of past discrimination to the extent practicable. *See Dowell,* 498 U.S. at 250, 111 S.Ct. at 638; *Freeman,* 503 U.S. at ——, 112 S.Ct. at 1446. In making this determination, the Court will first discuss evidence relevant to the District's compliance with the Judgment.[11] The desegregation requirements of the Judgment largely track the *Green* factors; in particular, the Judgment sets requirements regarding student assignment, faculty, staff, and facilities. Following the discussion of compliance with the Judgment, the Court will address evidence relevant to the *Green* factors not directly addressed by the Judgment: transportation, extracurricular activities, and student achievement.[12]

## A. Compliance with the Judgment

### 1. Subdistricts

Section I of the Judgment realigns the DISD into three subdistricts. *See* Judgment, at 2–3. However, the District is no longer divided into subdistricts for management purposes. Rather, the District is divided into eleven "Areas," each headed by an assistant superintendent. This section of the Judgment is therefore obsolete.

### 2. Student Assignment and Attendance Zones

Because the crux of the original constitutional violation was the legalized system of segregated schools, the traditional remedy for the violation was student reassignment. The DISD's reassignment of students has

---

**10.** The Court notes that the District has made conflicting requests regarding the three year period. Although the proposed judgment clearly accepts the Court's continuing supervision over the case during the transition period, the District filed a post-hearing memorandum of law suggesting that the case must be immediately dismissed upon a declaration of unitary status. *See* Defendants' Memorandum in Response to Court's Request Concerning Three Year Reporting Period, filed June 9, 1994; Plaintiffs' Response, filed June 22, 1994; and Intervenor's Response, filed June 27, 1994. As discussed previously, the Court is of the opinion that the Fifth Circuit requires at least a three year monitoring period following a declaration of unitary

status. *See supra* section I.C. In view of the requirements the Court imposes by this Opinion, the three year period is clearly warranted.

**11.** Hereinafter, "Judgment" refers to the desegregation decree issued by this Court on February 1, 1982, as amended in 1987, and all other relevant desegregation orders.

**12.** In addition to the traditional *Green* factors, the Supreme Court has approved the consideration of student achievement as a relevant factor in determining whether to declare a school district unitary. *Freeman,* 503 U.S. at ——, 112 S.Ct. at 1446.

inevitably involved busing, closing some schools, and redrawing attendance zones. Section II of the Judgment addresses desegregation by student assignment and the alteration of attendance zones in the DISD. *See* Judgment, at 3–5. The Judgment specifies the geographic boundaries of attendance zones for K–3 schools, and the feeder patterns for 4–6, 7–8, and 9–12 schools. *See* Judgment, at 3; Defs. Ex. 1, Data and Analysis, Apps. A & B. The Judgment also requires that any changes in attendance zones and student assignment be approved by the Court. The Court has approved many such changes over the years.

At the hearing, the District presented evidence to show compliance with the Judgment's directives regarding student assignment and attendance zones. The District is currently utilizing race neutral attendance zones.[13] (William Webster). Superintendent Chad Woolery and School Board President Rene Castilla promised the Court at the hearing that there would be no change in this policy. The increase in the number of one-race minority schools and predominantly minority schools is the result of the dramatic change in the ethnicity of the student population in the District over the years.[14] (William Clark); Defs. Ex. 1, Data and Analysis, App. A. There are no reasonable measures that can be taken to increase racial balance.[15] (William Clark).

Plaintiffs do not dispute the District's evidence. *See* Plaintiffs' Findings, at ¶ 47–48. Intervenor argues that the DISD is not unitary with respect to student assignment.

The Court commends the DISD's policy of drawing attendance zones to achieve the maximum possible desegregation in this predominantly minority school district. The Court finds that the District should take the following additional action regarding student assignment and attendance zones:

▶ Submit and obtain Court approval of a plan for returning students in the Ray attendance zone to their neighborhood school; these students are now bused to Franklin. *See supra* note 7.

### 3. Majority to Minority Transfers

To encourage voluntary desegregation in the DISD, the 1976 Plan included a Majority to Minority Transfer program ("M to M program"). *See Tasby*, 412 F.Supp. at 1217. Section III of the Judgment updates the standards and requirements for the District's operation of the M to M program. *See* Judgment, at 5–11. The M to M program allows an Anglo student in a school with more than 50% Anglo students to transfer to any school with less than 25% Anglo students, and a minority student to transfer from a school with more than 75% minority students to any school with less than 60% minority students. *See* Judgment, at 5–6. Incentives for participation include equal access to extra-curriculars, tuition credit with the Dallas County Community College District, free transportation, special counseling services, and an ombudsman service to provide information to parents. *See* Judgment, at 8.

At the hearing, the DISD presented evidence to show compliance with the Judgment's directives regarding the M to M program. The largest number of students to participate in the M to M program in the DISD was 2,623, in 1984–85.[16] In 1992–93, only 524 students participated in the M to M program.[17] Defs.Ex. 1, Data and Analysis,

---

**13.** There is only one predominantly Anglo school remaining in the DISD. (Chad Woolery). In 1993–94, there were 45 one ethnicity (>90%) schools; 43 predominantly one ethnicity (>75%) schools; 62 predominantly minority (>75% combined Black and Hispanic) schools; 32 desegregated schools; and 8 desegregated magnet schools. *See* Defs. February 15, 1994 Report to the Court.

**14.** In 1981, the Court held that "[e]xisting predominantly Anglo and minority schools (including any one-race schools) are not the result of

any present discriminatory DISD policies." *Tasby*, 520 F.Supp. at 705–06.

**15.** A school district is not required to achieve racial balance in all its schools. *See, e.g., Tasby*, 630 F.Supp. at 600.

**16.** In 1984–85, there were 190 Anglo students, 2,081 Black students, 241 Hispanic students, and 8 Others in the program.

**17.** In 1992–93, there were 3 Anglo students, 266 Black students, 246 Hispanic students, and 9 Others in the program.

Table III–5. The District argues that the declining number of participants in the program is due primarily to the increased minority enrollment in the District. Schools which could otherwise accept transfers have reached their capacity and are now closed to receiving M to M transfer students. Defs. Ex. 7. Only nineteen schools received M to M transfer students during the 1992–93 school year. Defs. Ex. 1, Data and Analysis, App. C. An expert on voluntary desegregation programs testified that the M to M program is successful in comparison to other school districts which, like the DISD, have less than 20% Anglo enrollment. (Christine Rossell). Chauncey King, DISD Director of Transportation, testified that bus service or reimbursement for private transportation is available to all M to M students; bus service is also available for M to M students who wish to participate in extracurricular activities. See also Defs. Ex. 11.

Sandra Malone, the Court-appointed External Desegregation Auditor ("the Auditor") testified that the number of students participating in the program may be undercounted because of a confusion by administrators between M to M transfers, curriculum transfers, and "merit transfers."[18] In addition, some M to M students are being returned to their neighborhood schools for behavioral infractions before the end of the semester, in violation of the Judgment. See Judgment, at 6, 8. The Judgment requires that M to M transfers have priority over curriculum or other transfers, but some schools closed to M to M transfers continue to take other transfers. See Judgment, at 7.

Conducting an informal survey, the Auditor found that very few M to M students utilize the tuition incentive program,[19] and very little of the earned money is ever distributed. The Auditor recommends that the amount of tuition incentive money be increased because of the rise in tuition at Dallas County Community College.[20] Although the District provided the Court with a brochure about M to M transfer opportunities that discusses the ombudsman and counseling services, the Auditor found that most parents and students were unaware of the services.

The Auditor also questioned the transportation available to M to M students. She noted that some schools listed by Chauncey King in his report on transportation showed buses to schools that are not receiving M to M transfer students. See Defs. Ex. 11. Many students and parents were unaware of the option for reimbursed private transportation or other public transportation. See Judgment, at 9. Testimony from Kathlyn Gilliam, a long time Black trustee on the school board, supported the Auditor. Finally, the Auditor stated that the District provided no information to show that sending schools are utilizing Court-ordered funds for personnel, materials, or other areas designed to improve instruction; in addition, the District has not updated the teacher salary in calculating the amount of money to be given to sending schools. See Judgment, at 9.

Intervenor contends that the M to M program has not been a successful desegregation tool. In particular, Intervenor is concerned that many students and parents are unaware of the program incentives.[21] See Intervenor's Findings, at ¶ 20. Plaintiffs do not question the usefulness of the M to M program. Rather, they suggest that unitary

18. "Merit transfers" are not addressed in the Judgment. They are the means by which a school allows, e.g., two siblings to attend the same school even though only one sibling is eligible for a special transfer. 1,999 students received merit transfers last year. (Sandra Malone).

19. The Judgment directs the District to provide: "$100 for each full year of participation in the M–M program, which can be used by the participant as tuition to the Dallas County Community College District. Each participant may accrue maximum of $400 credit. Tuition may be used only for tuition payments and must be used with-

in five years after the student graduates." See Judgment, at 8.

20. When the M to M program was initiated, tuition at DCCC was $100 per semester; $400 covered two full years of tuition. Tuition at DCCC is now $255 per semester; two full years of tuition now costs $1020. (Sandra Malone).

21. In 1981, the Court held that a primary reason for the low number of participants was "a lack of communication about the option with the minority community." Tasby, 520 F.Supp. at 748.

status should be conditioned on the continuation of the M to M program. *See* Plaintiffs' Findings, at ¶ 68.

In 1981, the Court stated that "it is abundantly clear that the [M to M] program as implemented by DISD is not accomplishing the degree of desegregation that it potentially can and should." *Tasby*, 520 F.Supp. at 748. Since that time, the number of students in the program has dropped from 1,392 to 524. The Court finds that the primary reason for this decrease is the declining number of eligible receiving schools. Although there is some opposition to the M to M program in the Black community (*see* testimony of School Board trustee Yvonne Ewell and former trustee Robert Price), the Court remains of the opinion that the M to M program is a valuable aspect of the desegregation effort. Improvements need to be made, however.

The Court finds that the following actions by the District are necessary and practicable to ensure full compliance with the Judgment and other directives from this Court regarding the operation of the M to M program:

▶Continue the M to M program and observe the requirements of the Judgment.

▶Ensure that M to M transfers are given preference over curriculum transfers and merit transfers.

▶Reevaluate the amount of award available for college tuition to reflect more accurately the cost of tuition at Dallas County Community College. The award should equal the cost of tuition for two full years, with a full academic load of fifteen hours.

▶Establish orientation and training for counselors regarding the Judgment's mandate for special counseling service to M to M students.

▶Implement the parental ombudsman services required by the Judgment.

▶Adhere to guidelines in the Judgment regarding the return of transfer students to their home schools.

▶Enforce the guidelines in the Judgment governing transportation. Students at all grade levels must be reimbursed for the costs of private and public transportation. Transportation must be available to ensure access to extracurricular activities.

▶Provide better publicity about the M to M Program and its incentives to students and parents.

### 4. Curriculum Transfers

Section IV of the Judgment directs the DISD to allow students who seek special courses not offered in their home schools to attend other schools that offer those special courses. *See* Judgment, at 12. The District is required to review these curriculum transfers for the impact they have on desegregation, particularly transfers for highly gifted courses and career education courses. *See* Judgment, at 12.

At the hearing, the DISD presented evidence to show compliance with the Judgment's directives regarding the curriculum transfer program. Only 732 students participated in the program in 1992–93; the number is divided fairly evenly among Anglos, Blacks, and Hispanics. *See* Defs. Ex. 1, Data and Analysis, at 58–59; App. D. The District concludes that the transfers have "had no effect one way or the other on desegregation." *See* Defs. Ex. 1, Data and Analysis, at 58–59.

The Auditor testified that school administrators do not know the difference between a curriculum transfer and a merit transfer. *See supra* note 18. The Auditor found that most of the confusion is caused by the fact that the same application form is used for curriculum and merit transfers. The confusion probably causes underreporting by the DISD of the number of curriculum transfer students. The Auditor also found that many parents and students were unaware of the curriculum transfer option.

Intervenor agrees with the DISD that the curriculum transfer program does not impact desegregation in the DISD; Intervenor makes no specific recommendation regarding its continuation. *See* Intervenors' Findings, at ¶ 22. Plaintiff also makes no recommendation regarding the program.

The Court is of the opinion that the curriculum transfer program should be continued

and strengthened. The Court finds that the following action is necessary and practicable for compliance with the Judgment and other directives from this Court regarding the operation of the curriculum transfer program:

▶Use separate application forms for curriculum transfers and merit transfers.

### 5. Magnet Schools ·

#### a. The Magnet Program

The magnet school concept, which is widely used now in school districts across the nation, attracts a diverse student population to centrally located schools for career, vocational, or other special programs. *See Tasby*, 520 F.Supp. at 746. This Court has endorsed magnet schools since the 1976 Judgment. *See Tasby*, 412 F.Supp. at 1205; *Tasby*, 520 F.Supp. at 747. Section V of the Judgment contains detailed directives to the DISD regarding the operation of magnet schools. *See* Judgment, at 12–19. In addition, the Judgment requires the District to review annually the effectiveness of all magnet programs, and to implement appropriate changes, subject to Court approval, to be certain that all magnet schools are effective as educational programs and as desegregation tools. *See* Judgment, at 15. In 1986 the Court set the ratios for magnet school admission at 40% Black, 40% Anglo and Other, and 20% Hispanic. In 1993, in recognition of the growing number of Hispanic students in the DISD, the Court reset the ratios to 32% Black, 32% Hispanic, 32% Anglo, and 4% Other. Order of September 24, 1993. The DISD magnet program currently consists of nine magnet high schools (including Skyline), eight middle school academies, and six vanguard elementary schools. Defs. Ex. 1, Data and Analysis, Table III–6; Table III–7.

At the hearing, the District provided evidence to show compliance with the Judgment's directives regarding the magnet program. The District had a difficult time determining how many students were currently enrolled in the magnet schools.[22] *Compare* Defs. Ex. 1, Data and Analysis, Tables III–6, III–7, and VIII–1. The latest number supplied to the Court for the 1992–93 school year is 11,086. *See* Defendants' Post–Trial Proposed Findings of Fact and Conclusions of Law, filed June 6, 1994, at ¶ 28. However, during the hearing, the District corrected its exhibits to indicate that 8,195 students were enrolled; the Director of the magnet program also testified that 8,195 is the correct number.[23] (Leon Hayes). The numbers and percentages of ethnic enrollment in the magnet schools have been fairly constant since the schools were created. *See* Defs. Ex. 1, Data and Analysis, Table III–6; Tables III–7. In 1992–93, the total enrollment of the magnet schools was 18% Anglo, 55% Black, 24% Hispanic, 2% Asian, and less than 1% Other. Defs. Ex. 1, Data and Analysis, Table III–7.

In 1992–93, twelve of the twenty-two vanguards, academies, and magnet high schools had more than 25% Anglo students. *See* Defs. Ex. 1, Data and Analysis, Table III–7. In addition to these twelve schools, two magnet facilities provided a mix roughly equal to the districtwide percentage of Anglo and Black students. (Christine Rossell). The Court received post-hearing information for the 1994–95 school year indicating that the District is coming closer to the Court-ordered 32–32–32–4 ratio in some schools. Memorandum from Sandra Malone, dated June 23, 1994.

Dr. Rossell, an expert on magnet schools, testified that the Dallas magnet schools were effective in increasing desegregation, increasing interracial exposure, and reducing racial isolation. *See also* Defs. Ex. 1, Data and Analysis, Table III–8; Table III–9. Dr. William Webster, Director of Research and Evaluation for the DISD, testified that magnet students achieve higher scores on stan-

---

**22.** The confusion arises in part from schools that house regular students as well as magnet students; the District counted all students in some of these schools, rather than only the magnet students. Some of these schools allow regular students to take advantage of some magnet classes; this further complicates recordkeeping. (Sandra Malone).

**23.** Ten percent (10%) of the Anglo students, nine percent (9%) of the Black students, and four percent (4%) of the Hispanic students in the DISD are enrolled in magnet programs. Defs. Ex. 2, Fig. 21.

dardized tests than do their non-magnet counterparts.

Approximately 5400 magnet students are afforded free transportation by the DISD as required by the Judgment. *See* Judgment, at 16; (Leon Hayes). Chauncey King, DISD Director of Transportation Services, explained that the remaining students get rides from friends, or have their own cars. King testified that buses are available for magnet students who participate in extracurricular activities.

The Judgment requires the District to use the proceeds from the sale of magnet facilities subject to Court approval. *See* Judgment, at 15. The District must observe this requirement.

In the fall of 1995, six of the DISD magnet high schools will move to Townview to create one supermagnet.[24] Townview, budgeted at approximately $30 million, is the number one priority of the 1992 Bond Project. Although there were many problems in the early phases of Townview planning,[25] those problems appear to have been solved. Dave Patton, Director of the DISD Bond Program, testified that Townview construction is currently on schedule. Reports to the Court show that the District is working with the staff of the present magnet schools, parents, and community groups to ensure that Townview is successful. *See* Townview Center Progress Report to the Court, filed June 1, 1994. The District recently appointed the Executive Principal for Townview. *See id.* Now that Townview construction is well underway, the focus of the District's attention will turn to the Townview educational program.

The Auditor provided the following testimony based on her on-site visits to the magnets, vanguards, and academies. She found that many need more modern equipment. In addition, vanguards and academies are not emphasizing the educational specialty for which they were created, and personnel are not being trained in the specialty. The Auditor also pointed out that the District provided no evidence that higher achievement

scores by magnet students are actually due to magnet instruction; there is some evidence that the programs are self-selective for higher-achieving students.

Plaintiffs suggest conditioning unitary status on: (1) the District's continuation of the magnet program at the current or higher level of funding; (2) the completion of Townview. *See* Plaintiffs' Findings, at ¶ 68. Intervenor stresses the limitations of the magnets as a desegregation tool, as evidenced by the District's figures and the testimony of the Auditor. Intervenor is concerned that transportation for magnet and M to M students is not adequate. *See* Intervenor's Findings, at ¶ 36. Intervenor contends that many magnet students may be precluded from participating in extracurricular activities because of the unavailability of buses. Intervenor recommends that the District prepare and implement a comprehensive management plan for the magnet program, separate from the one being developed currently for Townview. *See* Intervenors' Findings, at ¶ 49. Intervenor is also concerned that the Board has not yet determined whether Townview will be open to neighborhood students. *See* Intervenor's Conclusions, at ¶ 19.

The Court commends the DISD on the achievements of the magnet programs. The Court is of the opinion that, while several improvements are required, and stronger administration and leadership are needed, the magnet programs are successful and have a positive impact on desegregation. The Court finds, however, that the following actions by the District are necessary and practicable for full compliance with the Judgment and other directives from this Court regarding the operation of the magnet programs:

▸Continue the present vanguards and academies (including Montessori I and II), and the Lincoln and Booker T. Washington Magnets. Fund the magnets, academies, and vanguards at the current or higher levels.

---

**24.** The six magnets are Science and Engineering, Business and Management, Education and Social Services, Health Professions, Law and Government, and Talented and Gifted.

**25.** *See Tasby,* 807 F.Supp. at 422–23.

▶Complete and open Townview. *See supra* note 6, and *infra* at section II.A.10. The contingency fund included in the December 1992 bond package must be available for use on Townview should it become necessary.

▶Observe all requirements of the Judgment.

▶Follow guidelines in the Judgment governing transportation. Students should be reimbursed for the costs of private and public transportation. Transportation should be made available to ensure access to extracurricular activities.

▶Maintain screening committees with diverse ethnic membership for application to the magnets, academies, and vanguards. Committees should utilize standard selection criteria and should document the results of the screening process.

▶Consider changing the application timeline so that the selection process is completed well before the last day of school.

▶Require the 32–32–32–4 ratio to govern the enrollment at all grades, rather than just the entry grade at magnets, academies, and vanguards. To ensure that enrollment remains consistent beyond the entry grade, establish a minimum number of slots for magnet students at magnets schools housed within regular schools.

▶Provide pre-service and continued in-service staff development that addresses the needs of each magnet, vanguard, and academy school.

▶Observe the requirements of the Judgment to obtain Court approval before using the proceeds from the sale of the magnet facilities.

### b. The Honors Programs

Under the section of the Judgment addressing the magnet programs, the Court also directs the District to ensure that academic honors programs "do not become a means by which students become resegregat-ed in classrooms, although they attend school on desegregated campuses." *See* Judgment, at 18–19. The DISD must "carefully monitor the objective and subjective selection process for such programs to insure that no student or racial group is unfairly excluded." *See id.*

At the hearing, the District presented evidence to establish compliance with the Judgment's directives regarding the honors programs. The District maintains an extensive Talented and Gifted/Laureate (TAG/Laureate) program, an Honors program, and an Advanced Placement program (collectively, "the honors programs").[26] (Christine Rossell); Defs. Ex. 2, Figs. 26–29. Students scoring at or above the 80th percentile are automatically eligible for the TAG/Laureate program; the Honors program also has course average requirements. Students who do not meet the eligibility requirements may nominate themselves or be nominated by teachers. Advanced Placement courses are available to students who successfully complete a required sequence of instruction; students in Advanced Placement courses may receive college credit upon successful completion of an exam covering the course material. (Christine Rossell); Defs. Ex. 1, Data and Analysis, at 73–77. Dr. Christine Rossell, the District's expert witness, sent surveys to teachers to obtain information about participation in the honors programs. She did not visit honors classrooms, except at the TAG magnet high school. Relying on these surveys, Dr. Rossell concluded that the numbers of eligible students (as defined by those scoring at or above the 70th percentile) of various ethnicities enrolled in the honors programs reflect equality of access in entry to these programs.

The Auditor testified that enrollment figures she collected during her site visits did not support the enrollment figures offered by the District. Teachers and principals at the schools stated that fewer students are actually in the programs than the number found by Dr. Rossell. The Auditor concluded that the numbers reported by Dr. Rossell, *see supra* note 26, may indicate the number of students *eligible* rather than the number of students

26. In 1992–93, 9,832 elementary students and 6,177 secondary students were enrolled in the TAG/Laureate program. Defs. Ex. 1, Data and Analysis, Table IV–1. In addition, 3,679 students were enrolled in the Honors program, and 1,453 students were enrolled in the Advanced Placement program. Defs. Ex. 1, Data and Analysis, Table IV–2; IV–3.

actually *enrolled.* The Auditor noted that although the District may enroll *eligible* students on a nondiscriminatory basis, the overall percentages of minority students (with the exception of Asian students) in the programs are lower than the percentages of Anglo students in the programs.[27]

Plaintiffs do not dispute the District's evidence that students of all ethnicities have equal access to the honors programs. *See* Plaintiffs' Findings, at ¶ 45. Intervenor is concerned that the percentage of Black students in the honors programs is lower than the percentage of Black students districtwide. However, Dr. Rossell testified that the District makes a concerted effort to increase minority participation in the honors programs.

The Court is of the opinion that overall the honors programs are working well, and do not result in resegregation in the classroom. The Court finds, however, that the following actions by the District are needed to ensure full compliance with the Judgment and other directives from this Court regarding the operation of the TAG/Laureate program, the Honors program, and the Advanced Placement program:

▸Monitor more closely the participation of minority students in pre-honors, TAG/Laureate, Honors, and Advanced Placement programs.

▸Monitor more closely the participation of minority M to M Transfer and Curriculum Transfer students in pre-honors, TAG/Laureate, Honors, and Advanced Placement programs at the receiving schools.

## 6. Regular Schools (Elementary, Intermediate, Middle, and High Schools) and Bilingual Education

### a. Regular Schools

Section VI of the Judgment contains directives to the DISD regarding its regular elementary, intermediate, middle, and high schools. *See* Judgment, at 19–22. The District is substantially complying with these directives. With respect to early childhood education, the Judgment sets a goal for the District to achieve a ratio of one adult for every ten K–3 students and stresses effective involvement with parents and community groups. *See* Judgment, at 20. The Auditor testified that the one to ten ratio is not being met. The District provided evidence at the hearing that the number of volunteers brings the ratio near the required level. *See* Defs. Ex. 17. The District must increase its efforts to achieve the goal set by the Judgment.

The DISD must continue to provide a race neutral curriculum for all students. No program shall be adopted which might tend to discriminate against any class of students or which has the effect, whether directly or indirectly, of resegregating the schools. This prohibition shall not prevent the District from having courses based upon culture or ethnicity, or national origin (and similar programs). Modifications may be made in programs and curriculum to improve the effectiveness of educational delivery.

### b. Bilingual Education

The "regular schools" section of the Judgment also directs the DISD to continue its bilingual education program, and specifies requirements for bilingual instruction programs. *See* Judgment, at 21.

At the hearing, the District offered extensive testimony regarding its efforts in the areas of bilingual education. (Chad Woolery; Rosita Apodaca; Robby Collins; William Webster). In addition to the Judgment's mandates, the District must comply with state bilingual education requirements. Su-

---

**27.** Dividing the number of students in the program by the number of students enrolled in the grade grouping, in 1992–93 there were 17% Anglo, 12% Black, 10% Hispanic, 14% Indian, and 14% Asian students in the elementary TAG/Laureate Program. There were 19% Anglo, 12% Black, 10% Hispanic, 12% Indian, and 15% Asian students in the secondary TAG/Laureate Program. The higher percentages of Anglos in the Honors and Advanced Placement Programs are more dramatic: In 1992–93, there were 31% Anglo, 18% Black, 16% Hispanic, 19% Indian, and 35% Asian students in the Grades 9–12 Honors Program; there were 47% Anglo, 23% Black, 19% Hispanic, 14% Indian, and 62% Asian students in the Advanced Placement Program (primarily 12th grade students). Defs. Ex. 1, Data and Analysis, Tables IV–1, IV–2, and IV–3.

perintendent Woolery testified that bilingual education was one of the highest priorities of the DISD, which will soon become a majority Hispanic school district.[28] In 1992–93, the District spent almost $9,000,000 on bilingual education programs. Defs. Ex. 1, Data and Analysis, Table VI–3. The District has the following classroom programs: English as a Second Language (ESL), High Intensity Language Training (HILT), and English to Speakers of Other Languages (ESOL). In addition, the District participates in programs outside the classroom, such as the Home Instruction Program for Preschool Youngsters (HIPPY), the Valued Youth Program, Even Start, and the Migrant Education Program. (Rosita Apodaca). The effectiveness of these programs has been documented for some students, but the high dropout rate for Hispanic students, although improving, continues to be a problem. (William Webster).

The limited national and state pool of bilingual teachers makes it extremely difficult for the District to hire the number of teachers needed to serve the growing number of limited english proficiency (LEP) students;[29] the District's Alternative Certification program and Grow–Your–Own program help to fill the constantly increasing need for bilingual teachers. (Rosita Apodaca; Robby Collins).

The Court commends the DISD for its strong efforts in bilingual education.

## 7. Programmatic Remedies

Section VII of the Judgment directs the District to use programmatic remedies to improve minority achievement. See Judgment, at 23–30. These remedies are based on the Supreme Court ruling in *Milliken II*, supra. The Judgment defines "programmatic remedies" as "the utilization of financial and human resources to implement administrative, instructional, personnel development and community participation strategies that focus on closure of the achievement gap between minority students and their Anglo counterparts." See Judgment, at 23–24. Local schools are given the power to create remedies appropriate to the needs of their students. The District is directed to supply funds for carrying out these remedies and to supervise implementation of the remedies. See Judgment, at 24, 28–29. The Department of Research and Evaluation must evaluate annually the effectiveness of the remedies in eliminating the achievement disparity of minority children. See Judgment, at 25. This section of the Judgment also outlines the responsibilities of the internal desegregation monitor, who is primarily responsible for monitoring programmatic remedies. See Judgment, at 26–27. The Judgment includes an Appendix C that sets guidelines for programmatic remedies. The DISD is directed to implement these remedies in all predominantly minority schools. See Judgment, at 28.

At the hearing, the District offered scant evidence to show compliance with the Judgment's directives regarding programmatic remedies. Matthew Harden, DISD Associate Superintendent, Management Division, testified that the DISD spent $9,380,450 on programmatic remedies for predominantly minority schools in 1992–93. See also Defs. Ex. 1, Data and Analysis, Table VI–2.

Testimony from the Auditor and other witnesses indicated that there is much confusion about the purpose and effect of the programmatic remedies. (Sandra Malone; Kathlyn Gilliam; Yvonne Ewell). Administrators and teachers are not adequately trained to implement the programmatic remedies. (Yvonne Ewell). The Auditor testified that "programmatic remedies" has come to mean simply more money spent on low-achieving schools. Principals are unable to track the money they receive, or to show whether it was spent to improve minority achievement.

The Court commends the District on the amount of funds allocated for programmatic remedies, but finds that the District needs to improve its tracking of how these funds are

28. The Hispanic student population is increasing at the rate of 10% per year. (Rosita Apodaca).

29. The District needs an additional 600 bilingual teachers to serve the LEP students in the DISD. With fierce competition from other school districts for these teachers, it is currently impossible to find these additional teachers. (Rosita Apodaca).

spent. The Court finds that the following actions are necessary and practicable to ensure full compliance with the Judgment and other directives from this Court regarding programmatic remedies:

▶In all schools receiving the funds, require comprehensive training for all administrators in the operation and monitoring of programmatic remedies.

▶In all schools receiving the funds, require each school's improvement plan to address specifically the programmatic remedies to be implemented with the acquired funds.

▶Establish school-based recordkeeping to account for expenditures of desegregation funds within the categories specified in the Judgment.

### 8. Nolan Estes Plaza

Section VIII of the Judgment directed the District to make certain improvements to the schools located at the Nolan Estes Plaza. *See* Judgment, at 30–31. This section of the Judgment is obsolete.

### 9. Personnel

Section IX of the Judgment contains directives to the DISD regarding the recruitment, assignment, and training of faculty and staff. *See* Judgment, at 31–33.

#### a. Recruitment

The Judgment directs the District to attempt to employ principals, assistant principals, deans of instruction, certificated and professional personnel, and administrators so that the racial representation is 40% Anglo, 40% Black, and 20% Hispanic. *See* Judgment, at 31. The District must "continue to make diligent efforts to recruit, retain, and certify qualified Black and Hispanic teachers." *See* Judgment, at 31.

At the hearing, the District presented the following evidence to establish compliance with the Judgment's directives regarding staff recruitment. The District has an affirmative action plan to recruit qualified Black and Hispanic teachers. Robby Collins, DISD Executive Manager of Personnel, testified that recruitment of Black faculty and administrators has been relatively successful over the past ten years; the number of Black teachers and administrators has been increased in excess of their percentage in the labor market. *See also* Defs. Ex. 1, Data and Analysis, Table VII–1; Table VII–2; and Map VII–1. Recruitment of Hispanic faculty and administrators has been much less successful due to the intense competition throughout the state and nation for Hispanic personnel.[30] Defs. Ex. 1, Table VII–1; Table VII–2; and Map VII–1. The District has developed an Alternate Certification Program that allows persons with college degrees in fields other than teaching to become teachers; with this program, the District hopes to expand the pool of minority teachers. (Robby Collins). The District has also enlisted the aid of the Hispanic Chamber of Commerce to help retain Hispanic teachers once they are recruited. (Robby Collins).

The Auditor testified that in a recent Alternative Certification Class, there were forty-eight Anglos, forty-five Blacks, and seven Hispanics; thus, the program is not significantly impacting the pool of Hispanic teachers in the District at the present time.

Plaintiffs agree that the District has been successful at recruiting Black teachers, but less successful at recruiting Hispanic teachers. *See* Plaintiffs' Findings, at ¶ 42, 43. Intervenor notes that the District expects to increase employment of Black and Hispanic personnel. *See* Intervenor's Findings, at ¶ 35.

The Court commends the DISD's efforts to recruit minority faculty and staff. Those efforts must continue.

---

**30.** For the school year 1992–93, the DISD employed 8,262 teachers. The ethnicity of the teachers was 3,077 (37%) Black; 659 (8%) Hispanic; and 4,526 (54%) Anglo. The total number of top administrators is 415. The ethnicity of the top administrators is 212 (51%) Black; 77% (19%) Hispanic; and 126 (30%) Anglo. The number of central administrators is 117. The ethnicity of the central administrators is 44 (38%) Black; 22 (19%) Hispanic; and 51 (44%) Anglo. There are 27 additional administrators; their ethnicity is 12 (44%) Black; 9 (34%) Hispanic; and 6 (22%) Anglo.

### b. Assignment

### 1. Teachers

■ The former segregated system included assignment of faculty and staff by race; Black teachers were assigned to Black schools, and Anglo teachers were assigned to Anglo schools. To overcome the effects of that system, the law requires that the ethnic distribution of teachers in each school match the ethnic distribution of teachers district-wide. *See Singleton v. Jackson Mun. Separate Sch. Dist.,* 419 F.2d 1211 (5th Cir.1969). In 1971, the Court (Taylor, J.) ordered the District to comply with *Singleton* by reassigning 4,400 teachers. The DISD was allowed a plus or minus 2.5% variance from the required ratios. (Robby Collins). The Judgment gives the District some discretion to assign minority teachers outside of *Singleton* requirements:

> [I]f the needs of a given school clearly demonstrate that deviations from the above requirements are necessary in order to staff and administer the programs in predominantly minority schools, or such programs as special, vocational, and bilingual education in any school, the DISD shall have the discretion to assign minority teachers to these schools at variance with the respective percentages established by *Singleton.*

*See* Judgment, at 32–33. It further states, however, that in no instance "will minority teachers be assigned to schools merely because the student enrollment is predominantly minority." *See* Judgment, at 33.

At the hearing, the District presented evidence to show compliance with the Judgment's directives regarding teacher assignment. Dr. David Armor testified about his research on the District's assignment of teachers according to *Singleton. See* Defs. Ex. 1, Data and Analysis, Table VII–7, Table VII–8. He prepared no charts with the required plus or minus 2.5% variance, but instead used plus or minus 10% and plus or minus 15% variances. He testified that a plus or minus 2.5% variance is not possible

for any school district to maintain, and that no other school district to his knowledge imposed such a variance. The Court simply notes that the DISD has never requested a change in the required variance of plus or minus 2.5%.

Dr. Armor prepared charts showing the level of compliance with *Singleton* by school for the years 1969–70 through 1992–93.[31] Defs. Ex. 1, Data and Analysis, App. F. Although Dr. Armor testified that the District remained in compliance within a plus or minus 15% variance from 1971 to 1989, the figures do not support his testimony. In fact, the summary charts reveal that even using a plus or minus 15% variance, the District had approximately 40 out of 178 schools per year out of compliance with the required ratios. Defs. Ex. 1, Data and Analysis, Table VII–7.

Noncompliance with *Singleton* grew more severe beginning in 1989, when the Superintendent and Executive Manager of Personnel began to exercise their discretion to grant variances from *Singleton* in certain predominantly minority schools. (David Armor; Robby Collins). The District kept no record of the "clearly demonstrated needs" necessary to justify variances from *Singleton.* (Robby Collins; Rene Castilla). There was some indication that the new School Centered Education (SCE) model imposed by the State, which is a form of site-based management, was responsible for the shift away from compliance with *Singleton.* (Vivian Johnson). In addition, the Texas Education Code gives local school principals the authority to approve teacher appointments based on relevant criteria developed by the principal. (Robby Collins). During the 1992–93 school year, even applying a plus or minus 15% variance, 97 of 191 schools were out of compliance. Defs. Ex. 1, Data and Analysis, Table VII–7.

At the hearing, minority parents gave their opinions about the assignment of minority teachers in the schools. This testimony reveals that there is some conflict in the minority community about the usefulness of *Sin-*

---

**31.** Dr. Armor prepared summary charts only for the years 1982–83, 1983–84, and 1984–85. Defs. Ex. 1, Data and Analysis, Table VII–7.

*gleton* in a school district unable to hire enough minority teachers to mirror the minority student population. Some parents said that there were not enough qualified Black teachers for the predominantly minority schools in South Dallas, and that the qualified Black teachers in south Dallas schools are transferred to the North Dallas schools. (Nethal Beatrice Jackson; Rose Taylor). One parent stated that "early childhood teachers do not look like the kids they are teaching." (Nethal Beatrice Jackson). Another focus of the comments from parents was simply that teachers be "informed and qualified;" these parents noted that *all* teachers need to be trained in cultural awareness. (Rose Taylor; Shirley Ann Daniels).

Testimony by the minority trustees on the school board also conflicted somewhat with the rationale of *Singleton.* Hollis Brashear, a Black trustee, said that the District "needs more teachers that Black students can identify with culturally." He also testified that he had not been disappointed with the assignment of teachers to minority schools. He asserted that there should be more Black teachers to serve as role models in early childhood, noting that "minority teachers are better able to control minority students." Dr. Yvonne Ewell, a Black trustee, said that much of the noncompliance with *Singleton* results from the high number of Black teachers assigned to her district, which has a high proportion of predominantly minority schools. She said she agreed with the present assignment system "if teachers know how to teach. But I don't think skin color should be a factor." Kathlyn Gilliam, a Black trustee, testified that "it would be a step backward to use *Singleton* in this case without allowing for the present variances." She recalled that in 1971, when the Court ordered teacher reassignment to achieve compliance with *Singleton,* the best Black teachers were re-assigned to North Dallas schools. She believes that a variance option should be allowed for ethnic minority schools. School Board President Rene Castilla, who is Hispanic, testified that Hispanic students need Hispanic teachers.

In addition, Don Williams, the Director of the Learning Centers, testified that his K-6 faculty was 65% Black, although only 35% of K-6 teachers districtwide are Black; he believes a higher percentage of minority teachers is justified for the special circumstances in the Learning Centers. The Learning Centers are predominantly minority.

Plaintiffs suggest conditioning unitary status on the achievement of *Singleton* compliance throughout the three year transition period; thereafter, Plaintiffs ask that no faculty become racially identifiable. *See* Plaintiffs' Findings, at ¶ 68. Intervenor contends that the evidence clearly shows that the District has not complied with *Singleton* and therefore is not unitary with respect to teacher assignment. *See* Intervenor's Conclusions, at ¶ 15.

After the hearing closed, the Court directed the District to supply additional information regarding the number of teacher reassignments that would be necessary to achieve compliance with *Singleton* as of May 1994. The District's information shows that 925 of 5986 teachers must be moved to come into compliance using a plus or minus 2.5% variance, or 338 moved using a plus or minus 15% variance. *See* Defendants' Summary of *Singleton* Analysis by Different Variance Levels, May 1994, filed June 10, 1994.

### 2. Administrators

In addition to setting hiring goals for Black and Hispanic administrators, the Judgment requires the District to assign principals on a racially neutral basis, and in compliance with *Singleton. See* Judgment, at 32. Although the Judgment only specifies that "principals" must meet *Singleton* ratios, the District interpreted that term broadly and supplied the Court with information for all administrators (combined into one category). Administrators were evaluated by groups or schools as defined by Court categories, that is, desegregated, predominantly Black, predominantly Hispanic, predominantly Anglo, and predominantly minority (combined Black and Hispanic). Defs. Ex. 1, Data and Analysis, at 141. The District's figures show only the level of compliance for the 1984-85 school year and the 1992-93 school year. *See* Defs. Ex. 1, Data and Analysis, Table VII-9; App.

H. In 1992–93, administrators met the *Singleton* ratios, applying a plus or minus 15% standard and using a combined ethnicity criterion, with the following exceptions: (1) desegregated high schools have 63% Anglo administrators compared to 39% districtwide; and (2) desegregated elementary schools have 53% Anglo administrators compared to 28% districtwide.

### 3. Conclusion Regarding *Singleton* Compliance

The Court realizes the difficulties of compliance with *Singleton*. The Court therefore amends the Judgment to allow for a plus or minus 15% variance from *Singleton* ratios for teachers and principals. *See* Judgment, at 32. The Court finds that the following actions by the District are now necessary:

▸Achieve full compliance with *Singleton* ratios (plus or minus 15% variance) by the beginning of school in fall 1996.

▸Document the reasons for granting waivers to schools from *Singleton* compliance.

▸Ensure that teacher reassignments to achieve *Singleton* compliance do not place a disproportionate number of inexperienced minority teachers in predominantly minority schools.

### c. Training

The Judgment directs the District to provide in-depth training for teachers, principals, and administrators as needed to implement the requirements of the Judgment. *See* Judgment, at 33.

Black parents of DISD students gave generalized testimony about the lack of qualified and trained teachers in South Dallas neighborhood schools. (Nethal Beatrice Jackson; Rose Taylor; Shirley Ann Daniels). Some parents were concerned that the District's new site-based management program, School–Centered Education (SCE), would have a negative effect on the training of teachers at schools in their neighborhoods. Vivian Johnson, Director of School–Centered Education, testified that forty schools in the DISD are now working under the new site-based management program; forty additional schools are expected to implement the

program by the end of the 1994–95 school year. SCE could lead to disparity in teacher quality if the District failed to provide extensive training to the SCE school community council and to parents. Communities with a long history of involvement in their neighborhood schools will have an easy transition to SCE; the District will need to devote extra resources to ensure SCE participation in communities with historically limited involvement. (Vivian Johnson). Yvonne Ewell, a Black trustee, and Robert Price, a Black former DISD school board trustee, also stressed the necessity of quality teacher training in providing educational equality to all students.

The Court finds that the following additional action by the District is necessary and practicable to achieve full compliance with the Judgment and other directives from this Court regarding training:

▸Require and provide extensive training of personnel and parents in schools operating under the School Center Education Plan.

▸Observe the requirements of the Judgment.

### 10. Facilities

In addition to directing the construction of particular desegregation projects, the Judgment states that "[t]he DISD shall not construct, make any additions or major renovations, purchase, lease, sell, close, open, acquire or dispose of any school, building or other realty without prior approval of the Court." *See* Judgment, at 33. Over the years the Court has evaluated many requests about facilities for the impact they will have on the desegregation process; the District has substantially complied with this requirement of the Judgment.

At the hearing Ben Graves, an educational facilities expert, testified that facilities in predominantly minority schools in the DISD are identical in quality to those in desegregated and predominantly Anglo schools. *See also* Defs. Ex. 5. Mr. Graves did acknowledge that many facilities in the District are in need of maintenance, repairs, and additions; new schools are needed to accommodate the growing student population in cer-

tain parts of the District. The 1992 Bond Issue will provide $275 million for capital improvements in the DISD. According to the Bond Project Priority List approved by the Court, these improvements will be completed by the end of 1998. Defs. Ex. 6. Townview, and relief for overcrowding at the Fannin, Bonham, and Ray schools, are the two top priority projects under the Bond Program. (Dave Patton).

Shirley Ann Daniels and Robert Price, parents of students in DISD schools, offered generalized testimony that schools south of the Trinity River were inferior to schools north of the Trinity River. Two of the Black trustees also noted problems with predominantly minority schools in South Dallas. (Hollis Brashear; Yvonne Ewell). They expressed concern that if the Court did not retain supervision, the District would not follow through with the promises of the Bond Issue. (Hollis Brashear; Yvonne Ewell).

Plaintiffs agree with the District that facilities are currently being maintained, repaired, and constructed without regard to race. *See* Plaintiffs' Findings, at ¶ 41. Intervenor contends that vestiges of discrimination remain with regard to facilities. *See* Intervenor's Conclusions, at ¶ 24.

The Court finds that, upon completion of the projects funded by the 1992 Bond Election, facilities in the DISD will be equal or superior to those of most school districts in the nation. The Court finds, however, that the following actions by the District are necessary for full compliance:

▶Complete and open Townview within the timeline approved by the Court.

▶Complete the projects funded by the 1992 Bond Issue within the timeline approved by the Court.

▶Do not decrease the budgeted amounts for bond projects without Court approval.

## 11. Reporting and Monitoring

Section XI of the Judgment requires the District to provide the Court with reports related to desegregation in the DISD. *See* Judgment, at 34–40. This section also requires the External Desegregation Auditor to monitor DISD desegregation efforts and to supply a detailed annual report to the Court. *See* Judgment, at 40–42.

The Court directs counsel for the parties to confer with the Auditor for the purpose of reevaluating, and possibly eliminating in part, the desegregation reports provided to the Court. Following the meeting, the Auditor and counsel are directed to submit a joint report to the Court. The report should make recommendations regarding the desegregation reports and monitoring requirements of the Judgment, and should be submitted within sixty days following the date of this opinion.

## 12. Other Issues Relevant to Compliance with Court Orders

### a. Learning Centers

The Learning Centers were established to provide quality educational programs for minority students in neighborhood settings. *See Tasby,* 585 F.Supp. 453 (approving South Dallas Centers); *Tasby,* 630 F.Supp. 597 (approving West Dallas Centers).

At the hearing, the District presented the following evidence to establish compliance with Court Orders regarding the Learning Centers. Dr. William Webster, Director of Research and Evaluation for the DISD, testified that Learning Center students scored higher on achievement tests than non-Learning Center students. *See also* Defs. Ex. 1, Data and Analysis, Table VI–8. Recently, the District adopted a comprehensive new Learning Center Management Plan for the continuing development of the Centers; the budget for the Centers was also increased. *See* Defs. Ex. 10. Don Williams, the new Director of the Learning Centers, testified that he is strongly committed to the Centers' approach to high achievement for minority students.

Both Superintendent Woolery and Board President Castilla stated their continuing commitment to the Learning Centers. At the hearing, the District agreed to implement the Learning Center Program at the relief schools for the returning Fannin, Bonham, and Ray students.

The District's evidence shows that most Learning Centers have failed to meet their achievement goals since the relative goal system was implemented in 1990. *See* Defs. Ex. 1, Table VI-6. In addition, the most recent Learning Centers Facilities Report indicated that substantial facilities needs, identified in the Fall of 1993, had still not been met in June 1994. Defendants' Learning Centers Facilities Checklist, filed June 3, 1994.

Plaintiffs do not dispute that the Learning Centers are effective at increasing minority achievement. *See* Plaintiffs' Findings, at ¶ 21. Plaintiffs suggest conditioning unitary status on the construction and implementation of Learning Centers for returning students from the Fannin, Bonham, and Ray attendance zones. *See* Plaintiffs' Findings, at ¶ 68. Intervenor is concerned that the Learning Centers have not met Court-imposed goals. Intervenor also notes that substantial problems regarding staff, equipment, and facilities still exist at the Centers.

The Court finds that the Learning Centers are valuable in closing the achievement gap between Anglo and minority students. However, the following actions are necessary to ensure full compliance with this Court's decrees regarding the Learning Centers:

▶ Continue the funding of the Learning Centers at the current or higher level. Remedy the facilities needs outlined in the June 3, 1994 checklist.

▶ Meet the requirements of the recently adopted Learning Center Management Plan.

▶ Construct and open a K-6 Learning Center at the existing Ray facility, a 4-6 Learning Center at the Ross/Henderson site, and a K-6 Learning Center for relief from overcrowding at Bonham and Fannin (site unknown) within timelines approved by the Court.

### b. Allocation of Resources

In addition to evidence regarding physical facilities, *see* discussion *supra* at section II. A.10., the DISD presented evidence that other resources are allocated without regard to race. The District presented figures on per pupil spending of bond and non-bond funds. (David Armor); Defs. Ex. 1, Data and Analysis, Tables VIII-1, IX-3. Non-bond figures were given only for 1992-93; these figures show that per pupil spending is relatively equal regardless of the racial composition of the school. *See* Defs. Ex. 1, Data and Analysis, Table VIII-1.

Table IX-3 shows the expenditures for the three bond issues passed in 1976, 1984, and 1992, respectively. Defs. Ex. 1, Data and Analysis, App. L. Per pupil expenditures in magnet schools exceeded those of other schools. Predominantly Black and predominantly minority schools (combined Black and Hispanic) received greater allocations per pupil than did non-magnet desegregated schools. (Matthew Harden); Defs. Ex. 1, Data and Analysis, Table IX-3.

The District also provided evidence regarding the allocation of resources according to teacher characteristics. (David Armor); Defs. Ex. 1, Data and Analysis, Table VIII-2. Pupil-teacher ratios at the elementary level are smaller at predominantly Black schools. For other grade levels, the ratios are very similar. The percentage of teachers with masters degrees and median years of experience is also very similar from school to school, with the exception of predominantly Hispanic schools. Teachers at predominantly Hispanic schools have fewer masters degrees and median years of experience than teachers at other schools. *See* (David Armor); Defs. Ex. 1, Data and Analysis, Table VIII-2.

The District also presented evidence regarding the acquisition of supplies by schools. There have been several problems in the past; procedures have been changed to expedite the acquisition process. (Matthew Harden). Principals can now spend 10% of their budget at the local campus level to purchase supplies that are under $500 per item, without going through procurement. (Matthew Harden).

The Court finds that resources in the DISD are allocated equally, without regard to race or ethnicity. In calculating per pupil expenditures in the future, however, the Court directs the District to list all funds, including federal funds, implemented at the school level.

#### c. Racial Harmony on the School Board

Until recently the school board was composed of three Blacks, two Hispanics, and four Anglo trustees. (Since the hearing one Hispanic trustee has resigned to accept a federal appointment; his place has not yet been filled.) Although student enrollment in the District is 85% minority, the school board is approximately 44% Anglo in membership. When the hearing was in progress, Rene Castilla, who is Hispanic, was the President of the School Board; Sandy Kress, who is Anglo, was the Vice–President. On June 14, 1994, the Board elected Kress as President, and Hollis Brashear, a Black trustee, as Vice–President.

The three Black trustees testified at the hearing. They had opposed the School Board's decision to file the motion for unitary status, and contend that they were excluded from the decision. (Hollis Brashear; Yvonne Ewell; Kathlyn Gilliam). They also testified that votes for some major board decisions split along racial lines: the three Blacks vote together, and the two Hispanics and four Anglos vote together. Thus, they argue, the Black trustees are effectively disenfranchised. See id. Board President Rene Castilla disagreed.

Shirley Ann Daniels and Robert Price, parents of the DISD students, testified that the Black community does not trust the school board to make decisions in the best interests of Black children.

Plaintiffs suggest conditioning unitary status on the District's changing its governance in a way that would "assure that the school board's deliberative process is responsive to the public education constituency of the DISD." See Plaintiffs' Findings, at ¶ 68. One possibility would be cumulative voting. See Plaintiffs' Findings, at ¶ 64. Intervenor cites the racial conflict on the Board as an indication that all vestiges of prior discrimination have not been eliminated. See Intervenor's Findings, at ¶¶ 41, 45–46.

Although the Court is concerned about the contentious nature of Board deliberations where it could be perceived as racially motivated, the issue is not addressed in the Judgment or deemed to be a measure of desegregation in Green, 391 U.S. at 435, 88 S.Ct. at 1692. The Court therefore does not address the issue, but is pleased to note that the new President and Vice–President have vowed publicly to work together.

The Court recognizes the inevitability of good faith disagreements about governance. But it is time for all parties to put behind the schisms of the past and to work toward a superior education for all students in the Dallas Independent School District.

#### d. Future School Boards' Commitment to Desegregation Programs

Plaintiff and Intervenor both emphasize the unwillingness of the Superintendent and the School Board to commit to the actions of future board members if the District is declared unitary. See Plaintiffs' Findings, at ¶¶ 61–62, 64; Intervenor's Findings, at ¶¶ 40, 43, 47–48. Superintendent Woolery and Board President Rene Castilla did testify that, although they could not speak for future school boards, the administration had no plans to change any Court-ordered desegregation program should the Court declare the DISD to be unitary. The Court relies on this representation.

### B. Remaining *Green* Factors

#### 1. Transportation

To obtain a declaration of unitary status, the District must show that it has eliminated the vestiges of discrimination to the extent practicable in the area of transportation. See Green, 391 U.S. at 435, 88 S.Ct. at 1692–93. At the hearing, the District presented evidence that it provides transportation to all DISD students on a nondiscriminatory basis. (Chauncey King). Free transportation is made available to all students who reside more than two miles from their assigned school, and to all M to M transfer students, curriculum transfer students, and magnet students. (Chauncey King); Defs. Ex. 11. Transportation for extracurricular activities is made available on demand for M to M and magnet students. (Chauncey King).

Plaintiffs agree that the DISD is unitary with respect to transportation. See Plaintiffs' Findings, at ¶ 67. Intervenor contends

that there are vestiges of discrimination in the DISD in the area of transportation. Intervenor recommends that the District provide transportation for students who live less than two miles from their home school, but are transported from their home school to other schools. *See* Intervenors' Findings, at ¶ 36. The Court finds that this recommendation is not feasible.

The Court has noted elsewhere in this Opinion necessary improvements regarding transportation of M to M and magnet students. *See supra* sections II.A.3. and II. A.5.a. Relying upon the commitment and ability of the District to implement those directives, the Court finds that the District has eliminated the vestiges of discrimination to the extent practicable in the area of transportation.

## 2. Extracurricular Activities

■ To obtain a declaration of unitary status, the District must show that it has eliminated vestiges of discrimination to the extent practicable in the area of extracurricular activities. *See Green*, 391 U.S. at 435, 88 S.Ct. at 1692–93.

At the hearing, the District presented evidence that it provides access to extracurricular activities to all students on a nondiscriminatory basis. The District provided a table showing participation in extracurricular activities by ethnicity at each school. Defs. Ex. 1, Data and Analysis, Table X–1. The chart breaks extracurriculars into two categories, sports and organizations. "Organizations" includes high school band, choir, vocal ensemble, cheerleader, drill team, flag corps, pep squad, and orchestra.[32] Defs. Ex. 1, Data and Analysis, at 171. The District notes that, applying a plus or minus twenty percent variance, there are three high schools with racial imbalance in sports and one in organizations; three middle schools exhibited racial imbalance in sports and four in organizations. The District represents

that there is little racial imbalance with respect to extracurriculars.

Plaintiffs agree that the DISD is unitary with respect to extracurricular activities. *See* Plaintiffs' Findings, at ¶ 67. Intervenor argues that the DISD has provided insufficient evidence to assess whether there are vestiges of discrimination remaining with regard to participation in extracurricular activities. *See* Intervenors' Conclusions, at ¶ 24.

The Court has considered elsewhere in this Opinion needed improvements in access to extracurricular activities by M to M and magnet students. *See supra* sections II.A.3. and II.A.5. Relying upon the commitment and ability of the District to implement those directives, the Court finds that the District has eliminated the vestiges of discrimination to the extent practicable in the area of extracurricular activities.

## 3. Student Achievement

■ There is indication in the recent Supreme Court decision in *Freeman* that student achievement is an appropriate consideration in determining whether a school district is entitled to a declaration of unitary status. *See Freeman*, 503 U.S. at ——, 112 S.Ct. at 1446.

The District presented testimony on student achievement.[33] Dr. David Armor, a national expert on student achievement trends, testified about the minority achievement gap in the DISD. His research focused primarily on sixth grade student reading and math achievement test scores. *See* Defs. Ex. 2, Figs. 30–44. In 1976, all students scored below the 50th percentile on achievement tests. *See* Defs. Ex. 2, Figs. 31–32. Black and Hispanic students in the DISD scored approximately twenty points lower than Anglo students on both reading and math tests. The gap narrowed over the next fourteen years, resulting in a remaining gap between Anglo students and Black and Hispanic students of fourteen points in reading, and ten

---

32. It is unclear whether activities not related to sports or music were included, such as student government and academically-oriented clubs.

33. The District also provided evidence of supplementary funds spent to bridge the achievement

gap, for the 1990–91, 1991–92, and 1992–93 school years. Defs. Ex. 1, Data and Analysis, Table VI–3; (Matthew Harden). The table shows a general increase in dollars spent for the last three years.

to twelve points in math. *See* Defs. Ex. 2, Figs. 31–32. Dr. Armor testified that his research shows that most of the remaining achievement gap is due to socioeconomic factors, not to differences in or failures of DISD programs, *see* Defs. Ex. 2, Fig. 47, and that DISD has had more success than most other big cities in narrowing the gap.

Plaintiffs pointed out that when income is taken into account (as measured by whether or not students participate in the free lunch program), Anglo students continued to outscore minority students at about the same level, whether the students were middle income or at poverty level. *See* Defs. Ex. 2, Figs. 31, 33, 35, 36. Plaintiffs questioned Dr. Armor's assertion that other socioeconomic factors explained that gap, such as parent's level of education. Dr. Armor admitted that, even under his analysis, socioeconomic factors only account for 79% of the remaining gap. *See* Defs. Ex. 2, Fig. 47.

Plaintiffs argue that the District's achievement gap explanation fails to eliminate race as a factor in the remaining minority achievement gap. *See* Plaintiffs' Findings, at ¶ 58. Thus, Plaintiffs contend, the achievement gap must be presumed to be a vestige of the prior segregated system. *See* Plaintiffs' Findings, at ¶ 59. Intervenor also argues that the remaining achievement gap is a vestige of the prior segregated system. *See* Intervenor's Conclusions, at ¶ 8.

The Court commends the District for its efforts to close the achievement gap; the District must continue those efforts. The Court is unable to find that the achievement gap in the DISD is a vestige of the prior segregated school system. *See Tasby*, 520 F.Supp. at 707; *Tasby*, 713 F.2d at 96; testimony of Dr. Armor. The Court may revisit this issue before relinquishing jurisdiction over the case. *See Flax*, 915 F.2d at 163.

### *Conclusion*

The Court is of the opinion that, except as otherwise set forth in this Opinion, the Dallas Independent School District has eliminated the vestiges of discrimination to the extent practicable and has substantially and in good faith complied with the Judg-

ment and other desegregation decrees of this Court.

The Motion for Unitary Status is therefore **GRANTED.** In reaching this decision the Court considered three options:

(1) denying unitary status because of the deficiencies in compliance specified in this Opinion. This option would have failed to recognize the remarkable progress which the DISD has made in recent years.

(2) granting unitary status in some areas and denying it in others. The Court concluded that this option was not feasible; all aspects of desegregation in this school district are linked.

(3) granting unitary status while requiring the District to remedy during the three year monitoring period the deficiencies which the Court has specified. This option sets an achievable end to this litigation and recognizes the desegregation accomplishments of the DISD. The actions the Court requires relate to the continuation or completion of desegregation policies previously decreed. It should not be difficult for the District to accomplish these actions.

The skepticism of the Black School Board trustees and some in the Black community toward the Board's commitment to desegregation is understandable in light of the history of this case. For many years the DISD refused to recognize the Supreme Court's 1954–55 command to desegregate. However, the desegregation achievements of recent years lead the Court to believe that such intransigence no longer exists. The desegregation shortcomings pointed out in this Opinion are due primarily, and perhaps solely, to failures by a few district personnel to follow through in the implementation of established desegregation policies. From time to time the Court has expressed its impatience at the apparent lack of motivation and good management responsible for these problems.

The three year monitoring period which now commences affords the District ample time to remedy the relatively few problems mentioned in this Opinion. During the three year period the District will continue to re-

port to the Court and the Auditor will continue to monitor the operations of the District. After three years, if the District has continued to substantially comply with the Judgment and other desegregation decrees of the Court, and has met the requirements of this Opinion, the Court will hold a hearing at which Plaintiffs and Intervenor will have opportunity to show cause why the case should not be dismissed. Unless good cause is shown, the Court will then relinquish jurisdiction and dismiss the case by appropriate decree.

**SO ORDERED.**